Argued June 4, affirmed July 17, 1968

ROGER WILLARD JENSEN, *Appellant, v.*
GLADDEN, *Respondent.*

443 P. 2d 626

*Kenneth C. Hadley,* Deputy Public Defender, Salem, argued the cause for appellant. On the brief was Lawrence A. Aschenbrenner, Public Defender, Salem.

*Helen B. Kalil,* Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief was Robert Y. Thornton, Attorney General, Salem.

Before PERRY, Chief Justice, and McALLISTER,

SLOAN, O'CONNELL, DENECKE, HOLMAN and RODMAN, Justices.

RODMAN, J. (Pro Tempore).

This is an appeal from a judgment denying the petitioner relief in a post-conviction proceeding. In 1958 the petitioner was convicted of the offense of indecent exposure. Previously, he had been convicted of contributing to the delinquency of a minor. Pursuant to ORS 167.050 Jensen was sentenced to imprisonment in the state penitentiary for an indeterminate term, not exceeding his natural life.

The petitioner assigns as error the finding of the post-conviction trial judge that the admissions received in evidence at the indecent exposure trial were voluntary.

The function of the trial court and this Court in determining voluntariness of admissions and confessions is set forth in *Ball v. Gladden*, 250 Or 485, 443 P2d 621, decided this day. There we said:

> "What actually transpired is a question of fact for the trial court or jury. If the evidence sustains such historical factual findings they will not be disturbed by this court. If findings are not made on all such facts, and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the ultimate conclusion, e.g., voluntariness or lack thereof, made by the trial court or jury. Whether these historical facts as found are sufficient to sustain a finding of voluntariness which meets state and federal constitutional concepts of due process is another question, and one which falls within our proper scope of appellate review. * * * [Citations omitted.] In

other words, we are not bound by a trial judge or jury's finding of voluntariness if we believe the historical facts upon which such finding is based are insufficient to meet constitutional standards of due process. This is pursuant to our duty to interpret constitutional standards and require conformance thereto."

■ The post-conviction court found that the written admissions introduced into evidence at the petitioner's original trial were voluntarily given by him and were not the result of threats or promises by any person. There is little conflict as to the historical facts surrounding the taking of the written statement which the petitioner claims to be involuntary. Where there is a conflict it will be resolved in a manner consistent with the trial court's determination of voluntariness. *Ball v. Gladden*, supra.

The petitioner, in 1958, was 31 years of age. He had completed the tenth grade of school and attended business college for one year. He had served two separate enlistments in the armed forces and received an honorable discharge on termination of service each time. At the time of trial he was on probation for the earlier conviction of contributing to the delinquency of a minor. Jensen had been married but was divorced at the time of trial. There was evidence from a clinical psychologist and from a psychiatrist that he had an intelligence quotient of 76 on the "Western [Wechsler] Adult Intelligence Scale"—80 to 89 is dull normal and 70 to 79 is borderline on that scale. Both witnesses found that he was not psychotic, mentally defective or retarded.

Dr. Charles H. Derthick, the clinical psychologist, testified that:

"A My feelings are that he is a person with

limited intellectual ability, a person who is emotionally disturbed and, as I said before, a person with a relatively fragile emotional makeup. It seems to me that he is easily swayed and led to a point of view other than his own and that he has difficulty in looking at his own ability and his own talents realistically."

The witness said that one with a fragile personality is more easily led or swayed by others. His opinion was that more than 20 per cent of the general population have personalities as fragile as that of the petitioner. Dr. Derthick's examination of the petitioner was made in 1967 and he conceded that Jensen's personality may have deteriorated emotionally since 1958.

Dr. William H. Cloyd, the psychiatrist, had examined the petitioner periodically, beginning in 1962. He found him to be of borderline intelligence and an inadequate personality who "would perhaps more than the average person be suggestible and be swayed by people in authority."

On March 22, 1958, the Eugene police department received a report that an unknown person had exposed himself sexually to children on the Whitaker School grounds. In the late afternoon two officers went to the petitioner's home, which was one-half block from the school, and asked him to accompany them to police headquarters for questioning. They advised him that he was not charged with any offense. After questioning at the police station by these two officers, and at times a third, for 45 minutes to one hour, the petitioner made admissions that he was on the school grounds; that he had seen two small girls there and that at a time when he knew they were watching him he relieved himself. Jensen testified that three or four times before he made the admissions the officers accused him of

being the man involved and he denied it. The officers said that it may have been seven or eight times that they accused him and he denied the charge. At the post-conviction trial the petitioner testified:

"Q Eventually did you admit exposing yourself?

"A I admitted it after they kept saying it was me.

"Q And did they ask you to sign a written statement?

"A Yes, they did.

"Q Did you sign a written statement?

"A Yes.

"Q That was offered and admitted in evidence against you at your trial?

"A It was, yes.

"Q Why did you sign this paper?

"A I can't tell you why I did. I just happened to—They said it was me. I thought they would get rough if I didn't.

"Q Why did you think they might get rough?

"A The tone of their voices.

"Q What did they say?

"A They come out real strong and said they knew it was me.

"Q So you signed it?

"A Right.

"* * *

"Q While you were being questioned were you nervous?

"A I was.

"Q Tell the court just how you felt.

"A I was all shook up.

"Q What were you shook up about?

"A Just more or less nervous anyway.

"Q. What disturbed you about being down there and being questioned?

"A. Just the police officers being there questioning me made me nervous.

"Q Did you have any fear that something that might happen to you physically?

"A I thought so maybe if I didn't sign it.

"Q What did you think might happen to you if you didn't sign it?

"A Maybe bodily harm if I didn't sign.

"THE COURT: What led you to that conclusion?

"A More or less how they spoke.

"THE COURT: How? What did they say?

"A They were kind of harsh speaking.

"THE COURT: You mean what they said or their tone of voice?

"A Tone of voice.

"THE COURT: How would describe it?

"A Kind of harsh.

"THE COURT: How was it as to volume?

"A Fairly loud.

"* * *

"Q Just what was it you were so fearful of? What did you think they were going to do to you?

"A I don't know. I was just more or less scared I guess.

"Q Of what?

"A Harm.

"Q In what way?

"A I just figured if I didn't sign it they might try to use force.

"Q What gave you that impression?

"A I can't say; it was just in my own mind.

"Q Were they mean to you?

"A No, they were not exactly mean.

"Q Any of them threaten you at all?
"A No, just loud voices.

"Q Did they promise you anything if you would sign it?
"A No, they did not.

"Q Or did they make any threats if you didn't sign it?
"A No, they did not."

Two of the three officers testified and denied that loud or harsh voices were used.

The petitioner's probation officer visited him in jail shortly after he had signed the statement. His testimony in part was:

"Q What was the purpose of talking to him alone?
"A My purpose in talking to him alone was to be sure, to be able to talk to him and determine whether or not he had been mistreated in any way, which is a policy we follow to be certain that our people on probation receive fair treatment and no police brutality or anything of this nature.

"Q Did you discuss this subject with Mr. Jensen?
"A Yes.

"Q Did he at any time complain about the police behavior to you?
"A No.

"Q Did you discuss the statement that he gave the police?
"A Yes, ma'am.

"Q Did he indicate to you in any way at all that he was coerced or forced somehow into signing the statement?
"A No, ma'am.

"Q Did he make any complaints to you whatsoever?
"A No.

"Q   Did he make any comments to you about the statement?

"A   Only when we had the copy, the statement which was before us, which we were looking at together and discussing it and I asked him if it was true what was in the statement and he said it was."

There are no serious differences between the versions of the petitioner and the state as to what occurred. The trial judge hearing and observing the witnesses is best able to determine whether the petitioner was "more or less scared," and, if so, what role this may have played in his decision to make admissions to the officers. We presume that the trial court found that either the petitioner was not afraid or that his fear was not a significant factor in producing the admissions. *Ball v. Gladden,* supra.

■ We hold that the historical facts as thus found are sufficient to uphold a finding of voluntariness consistent with the constitutional requirements of due process.

The judgment is affirmed.