Argued July 9, reversed and remanded November 8, 1968

## STATE OF OREGON, *Respondent, v.* ROBERT LAWRENCE ATKINS, *Appellant.*

446 P. 2d 660

*George V. Des Brisay,* Portland, argued the cause for appellant. With him on the brief were Franklin, Olsen, Bennett, Des Brisay & Jolles, Portland.

*Jacob B. Tanzer,* Assistant Chief Deputy District Attorney, Portland, argued the cause for respondent. With him on the brief was George Van Hoomissen, District Attorney, Portland.

Before PERRY, Chief Justice, and MCALLISTER, SLOAN, O'CONNELL, GOODWIN, DENECKE and RODMAN, Justices.

RODMAN, J. (Pro Tempore).

The defendant appeals from his conviction of first degree murder of Lynn Michael Wilson. Wilson, the swing-shift attendant at the B & R Texaco station in Portland, had been working alone the evening of October 28, 1965. At 11:30 p.m., the station was found open, but unattended. Two new tires were missing and $173 had been taken from the cash register. The next day Wilson's body was found beside a road a few miles from the station. He had been shot four times in the back of the head and neck and his hands were tied behind him. There was no money on the body.

In March 1966, the defendant and one Lawrence G. McManis were jointly indicted on a charge of first degree murder of Wilson. The defendant was tried, convicted and sentenced to life imprisonment. His only assignment of error is the receipt in evidence

of admissions made by him to police officers. He claims that in connection with the eliciting of these admissions he was denied the right to have his counsel present, was not advised of his constitutional rights and his statements were the product of coercion.

The background facts necessary to understand the defendant's contentions are complicated and bizarre. The defendant was the father of an infant child born of one Rose Grant. Tom Sipes was the brother of Miss Grant. Through the defendant's association with Miss Grant, he had known Sipes for several years.

Several weeks before the murder, the defendant, Rose Grant, Tom Sipes and Sandra Williams were arrested by Portland city police and charged with an "after hours" ordinance violation. Some time before, a complaint had been filed against these four charging them with armed robbery, but they had not been previously apprehended. The women had lured two men named Snyder and Young from a Portland night club to a secluded place; there Sipes and Atkins robbed them at gunpoint. At a lineup conducted in the jail the victims of the armed robbery identified the two women; however, they were unable to identify the defendant or Sipes. The defendant was sentenced to ten days in jail on the ordinance violation, Sipes was held in custody on another charge pending against him, and Miss Grant and Miss Williams were detained on the armed robbery charge. This crime will be referred to as the Young-Snyder armed robbery hereafter. By October 28th, the date of the Wilson murder, the defendant had been released from custody; the others remained in jail.

In the early evening of October 28th, the defendant went to the home of Mrs. Laverne Grant, the mother of both Miss Grant and Sipes, and asked her

to help him "pull a job" that night, because he needed money. Mrs. Grant testified that the defendant expressed bitterness over the lineup identification of Rose Grant, and said that if he committed a crime again he would "blow their brains out." Shortly after the murder, the defendant, his father, and Lawrence G. McManis drove to Georgia. Before they left, the defendant put two new tires on the car used for the trip. There was other scientific and testimonial evidence tending to prove that Atkins and McManis were the murderers which it is unnecessary to set forth in this opinion.

At the trial Multnomah County detectives Earl Son and Jack Elliott testified that the defendant admitted his presence at the robbery and murder, but claimed that it was the codefendant McManis who forced Wilson into the car and subsequently shot him. They also testified that the defendant made admissions concerning the tires stolen from the service station. It is these admissions which the defendant claims were erroneously received.

The trial court held an *in camera* hearing to determine the admissibility of the defendant's statements. The court found that the defendant had been fully advised of his constitutional rights, had waived the right to have his attorney present when he gave the statements, and had made the statements freely and voluntarily.

■ The evidence is clear that on the two occasions he made admissions he was fully advised of his constitutional rights by the officers questioning him. On the first occasion, he was also advised of his rights by his attorney immediately prior to the questioning. Earlier he had been advised of these rights by another police officer and by a district judge. There can

be no doubt that he was advised of and fully understood his rights in connection with the making of the incriminating statements.

The essence of the defendant's other contentions is that the police placed Sipes in the defendant's cell block with instructions to obtain a confession to the Wilson murder from the defendant; that Sipes struck the defendant and threatened to kill him unless he confessed to that crime, and that because of his fear of Sipes he falsely confessed to participation in the murder; he also contends that he was questioned in the absence of his attorney immediately after the attorney had demanded the right to be present. In addition to the facts recited above the following evidence was produced at the *in camera* hearing:

On November 10, 1965, the defendant was arrested and arraigned on the Young-Snyder armed robbery charge. He remained in jail at all times thereafter through the month of January 1966. Sipes likewise remained in jail through this period.

On December 21, 1965, the defendant appeared before the judge of a different department of the Multnomah County circuit court on the Young-Snyder armed robbery charge and was permitted to enter a plea of guilty to the included offense of unarmed robbery by putting in fear. On December 22nd, the defendant again appeared in court and asked to be permitted to withdraw his plea of guilty. His attorney, George Tamblyn, advised the court that he had mistakenly told his client that he had the right to withdraw his guilty plea if he later changed his mind. On this basis, the court permitted the withdrawal of the guilty plea made the day before. After the withdrawal, the defendant told the court that, in fact, he wished to enter a guilty plea but he feared to do so because

of the threat of physical retaliation from his code-fendant, Sipes, when Sipes learned that he had plead guilty. The judge acknowledged that the chief criminal deputy of the Multnomah County district attorney's office had previously discussed this problem with him. Sipes's trial on the armed robbery charge had been set down for January 14, 1966.

After a discussion between the judge, the deputy district attorney in court, and the defendant's attorney, an understanding was reached that Atkins would orally enter his plea of guilty, but that no journal entry or other public record would be made of the plea until after Sipes had been tried. On this basis, the defendant again entered a plea of guilty and a presentence report was ordered.[1]

---

[1] A partial transcript of those proceedings is as follows:

"* * * * *

"THE COURT: You did want to get it straightened out—that there was—if there's a misunderstanding between you and Mr. Tamblyn. You were apparently of the impression that you could withdraw that—enter a plea of not guilty, but nevertheless, you want that straightened out and you still want to enter a plea of guilty, but you have a little problem with the co-defendant?

"MR. ATKINS: Yes.

"THE COURT: Well, now this matter here is a matter in open Court, naturally as all criminal proceedings, but I feel you certainly can go right ahead and tell the Court what your problem is and desire is at this time. I think the matter can be handled judiciously. You go ahead.

"MR. ATKINS: Well, I changed my plea to guilty yesterday and my—I mean because I—that's what I wanted. I wanted to plead guilty to a lesser charge, and put this thing aside and save the State—you know—and the Court a lot of time and trouble for something that was done, I mean it was my own act—that I did it, but upon returning to Rocky Butte yesterday, the co-defendant found out I changed the plea to guilty and—well, he said if I didn't change it back to not guilty, what was going to happen. So—I mean I have to live with them guys. I can't plead guilty and have him and the rest of them jump on me for it. I mean I'm out there with

a bunch of guys and where they feel this way, and if I pleaded guilty to this charge against—they said not to plead guilty to it, and in his words, I ain't going to look very pretty. So, he's pretty big and I'm pretty small.

"THE COURT: Well, I certainly can appreciate your concern.

"MR. ATKINS: I don't know what to do, your Honor. I sure—I would like to plead guilty. That's what I want to do. I want to get it over with, but still I—he knows I changed my plea to guilty and he thinks that I'm messing him around, and I'm not.

"THE COURT: I know. I started to say I can appreciate your concern. I probably would share it were I in your position, but certainly I'm not going to be a party to or—by one way or the other endorse or condone any intimidation by anybody out there as far as I'm concerned. I'm not custodian of the jail—we can't have a position—if a man has transgressed against our social laws—wants to admit this, wants to enter a plea and have disposition made, I don't want to have somebody else who is a defendant, guilty or not, intimidate him or injure him for that matter.

"MR. ATKINS: I don't know what to do, your honor.

"THE COURT: I don't know either. I'm trying to think a little bit.

"MR. ATKINS: It's not the fact so much as it could—could from the co-defendant himself—he' has friends there. If I move to another tank, it still would happen.

"THE COURT: Is he some big operator out there? What's the co-defendant's name?

"MR. HAMPTON: Mr. Sipes, your Honor. He has a record and I may say without prejudicing him in the eyes of this Court, he's also wanted in California for similar robbery pattersn [sic].

"THE COURT: He has a plea of not guilty,? Has he been arraigned?

"MR. HAMPTON: His trial is set for, I believe it's the 14th or 17th of January.

"THE COURT: For armed robbery?

"MR. HAMPTON: Yes. He has a charge of obtaining money by false pretenses. One is for the 14th, the other is the 17th of January, 1966.

"THE COURT: The chief criminal deputy was in this morning to talk to the Court about this, Mr. Hampton, and admin-

Up until this time Sipes and the defendant had shared the same cell block. After the defendant's second guilty plea, Sipes was placed in what was described as Tank A and the defendant in Tank B.

Despite the efforts of the attorneys and judge to keep Sipes from learning that the defendant had entered a guilty plea in the Young-Snyder robbery case, Sipes became aware of it.

In early January 1966, Detectives Son and Elliott learned from jailhouse informants that the two men had had a "falling out." Previously, Son and Elliott had heard rumors that the defendant was involved in the Wilson murder. The detectives contacted Sipes and asked him to attempt to find out from the defendant the location of the Wilson murder weapon. He said he would attempt to do so if he were placed in the same cell block with the defendant. This was done. Sipes testified that the officers told him that if he succeeded, the criminal charges against him in Oregon would be dropped and he would be released to the California authorities to answer to criminal charges pending there. Son and Elliott denied making any promises to him.

---

istratively, why can't we just continue this matter for the time being?

\* \* \*

"THE COURT: \* \* \* I'll just withhold signing the order, Mr. District Attorney. That will take care of the matter as far as you're concerned. You realize my position here. I don't want to be any part of any condoning to any intimidation, but from a practical—I'll accept your plea of guilty and I'll not sign the order until such time as Mr. Sipe's order has been disposed of. Tell your friends out there and—at least that's the court's feeling right now. If I decide it should be handled some other way, I'll let you know. That's the way I'll handle it. I'll accept your plea of guilty and suspend the signing of the order making it official until a further future date \* \* \*."

About a week later, on January 14th, Sipes told the detectives that they did not need his help in finding the gun because the defendant wanted to confess to the murder. Arrangements were made for the defendant to be brought from the jail to an interrogation room for questioning. By chance, George Tamblyn was in a corridor of the Multnomah County courthouse on other legal matters and saw the detectives escorting the defendant to the interrogation room. He demanded to know where his client was being taken. Upon being advised that Atkins was going to be questioned, he took him to a private room and advised him of his rights. Mr. Tamblyn testified:

"A  *  *  *  We went back to the attorneys' interviewing room and I asked him what they were going to talk to him about and he said, 'Well, they want to talk to me about this service station murder,' and I said, 'Are you a suspect in that?' and he says, 'Yes.' I think that's—and so I told him that my appointment as his attorney for the armed robbery didn't mean I was his attorney for anything else.

"Q  You made this perfectly clear to him that you were only appointed to defend him on that assault with a deadly weapon, armed robbery?

"A  The armed robbery, yes.

"Q  What was his reaction to this?

"A  Well, I don't know as he reacted to that. I went on to say that if he wanted—if he desired, I would counsel him anyway with respect to at least the interrogation stage of this murder charge, and that if he was subsequently indicted, why, we would take a second look at my commitments and how we felt about each other in respect to this further representation at that time, and he said yes, he would like that, and then I proceeded to tell him that my advice to him as his attorney, therefore, was not to talk to the detectives at all, and I made it

quite clear that if he really wanted to talk to them, I should be there.

"Q All right. What was his reaction to this, Mr. Tamblyn?

"A He said, 'All right'—I mean, 'I won't talk.' "

At Mr. Tamblyn's direction, the defendant was returned to his jail cell. Before leaving the building the attorney informed the jailer that the defendant was not to be questioned except with his permission and in his presence. The jailer advised the two detectives of his conversation with Mr. Tamblyn. They asked to be informed when the attorney had left the courthouse.

As soon as they learned that Mr. Tamblyn had left, they again had the defendant brought from the jail and took him to an interrogation room. Sipes was also brought to that room and remained there throughout the questioning that followed. Son and Elliott testified that Sipes was present at the defendant's request. The defendant denied this. The officers advised the defendant of his rights, and, according to their testimony, he said: "I've been informed by my attorney not to speak to anybody, but, I feel that I should tell this and get it off my mind. I want to talk to you." The defendant then admitted his participation in the crime.

On January 24, 1966, the defendant was again questioned by the same officers and made admissions as to the disposition of the tires stolen from the service station. Sipes was not present.

The officers acknowledged that they were aware of the rumors of hostility between the defendant and Sipes at the time they asked Sipes for his cooperation, but testified that Sipes told them that he and

Atkins were "back on speaking terms again." They said that during the first interrogation, the two men appeared to be friendly and that the defendant displayed no sign of being afraid or unwilling to talk. The defendant testified, however, that he made admissions to the officers only because of his fear of Sipes. Both the defendant and Sipes testified that after they had been placed in a common cell block in early January, Sipes had knocked the defendant down and had threatened to kill him if he did not confess to the murder.

The defendant is a small man. Sipes was described as 6' 3" tall and weighing 214 pounds, with a 52-inch chest and 17-inch biceps. He had a reputation for violence and had previously been convicted of felonies involving force. At the time here involved he was being held in custody on the Young-Snyder armed robbery charge, check charges and another armed robbery charge. He was also being detained for California authorities for an armed robbery charge in that state.

Prior to the present trial, Sipes was tried on the Young-Snyder robbery charge, found guilty and sentenced to 20 years in the penitentiary. At the *in camera* hearing, Sipe's attorney was called as a witness for the defendant and questioned as to any promises that may have been made to Sipes in order to obtain his cooperation in the murder investigation. He was unwilling to discuss conversations between himself and Sipes on the grounds that they were privileged communications between attorney and client. Sipes, who had been transferred from the penitentiary to the Multnomah County courthouse jail in order to testify at the murder trial, was brought to the courtroom in order to determine if he wished to waive the privilege. Concern was expressed for the physical

safety of the attorney if he and Sipes were in the courtroom together. Consequently, at the suggestion of the trial court, the attorney was permitted to leave the courtroom by a back door and remain out of the courtroom during the time that Sipes was there.

Sipes waived the attorney-client privilege and was returned to jail. The attorney re-entered the courtroom and testified that before Sipes's trial on the armed robbery charge he told the attorney that he had "worked a deal with somebody upstairs" and "wasn't too concerned."

This attorney also testified to an incident that occurred immediately after Sipes was sentenced to the penitentiary. Sipes became belligerent in the corridor outside the courtroom and refused to return to the jail. The witness described his appearance as that of a cornered animal. It became necessary for a deputy sheriff to unfasten his gun holster cover before Sipes could be returned to his cell.

There was testimony that while at the penitentiary, Sipes became involved in a fight with another inmate, causing Sipes to be placed in isolation and the other man hospitalized.

At the conclusion of the *in camera* hearing the trial court found that the statements of the defendant were freely and voluntarily made, but did not make specific findings of fact. Upon review, this court will not re-examine the historical facts found by the trial court in a hearing to determine the voluntariness of a confession or admission; and where the trial court does not set out its fact findings, we will presume that it found facts consistent with its determination of voluntariness *vel non*. It is the role of this court to examine the record as thus made and make an independent determination of the ultimate issue

of voluntariness in accordance with constitutional concepts of due process. *Clewis v. Texas,* 386 US 707, 87 S Ct 1338, 18 L ed 2d 423 (1967); *Davis v. North Carolina,* 384 US 737, 86 S Ct 1761, 16 L ed 2d 895 (1966); *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968); *Jensen v. Gladden,* 250 Or 499, 443 P2d 626 (1968).

We will presume the trial court found that: (1) the officers made no promises to Sipes; (2) Sipes did not assault or threaten the defendant; (3) the detectives believed Sipes and the defendant to be friendly toward one another; (4) the defendant made the statement that he wanted to talk in the absence of his attorney.

However, there are also the following uncontroverted facts:

(1) The defendant and Sipes were co-indictees on the Young-Snyder armed robbery charge.

(2) When the defendant entered a guilty plea to the reduced charge of unarmed robbery, a circuit judge found it necessary in order to protect the defendant from Sipes to follow the unique procedure of making no formal entry of the guilty plea so that Sipes would not hear of it.

(3) After the defendant entered this plea, the jail authorities placed him and Sipes in separate cell blocks.

(4) Sipes was a very large and powerful man, with a reputation for violence. He had been convicted in the past of felonies involving violence. In addition to the Young-Snyder robbery charge on which he was jointly indicted with the defendant, he was being held in custody on another armed robbery charge. He was also being detained for California authorities for an alleged armed robbery in that state.

His own attorney was afraid to be present in a courtroom with him.

(5) Sipes had learned that the defendant entered a guilty plea to the charge on which they were jointly indicted. There were rumors among the jail inmates of ill will and hostility between the two men.

(6) The detectives were aware of these rumors and aware of the nature and background of Sipes. In order to obtain information through Sipes, the detectives placed the two men in the same cell block and within a week the defendant was apparently prepared to confess.

(7) With knowledge that the defendant's attorney had demanded the right to be present if his client was questioned, the detectives conducted the interrogation in such a manner that the attorney would be unaware of it.

(8) Sipes was present in the interrogation room when the defendant made his admission.

■ The facts may be stated even more starkly: While officers of the law employed unusual means to protect a prisoner from an instrument of danger, other officers simultaneously exposed him to the same instrument of danger for the purpose of obtaining admissions. This does not measure up to the standards of fair play required of the state in dealing with its citizens.

The totality of the circumstances surrounding the statements present a greater risk of coercion than can be countenanced. *Fikes v. Alabama,* 352 US 191, 77 S Ct 281, 1 L ed 2d 246 (1957) ; *Clewis v. Texas,* supra. The lower court erred in finding the statements voluntary and in admitting them in evidence.

The appellant also contends his Sixth Amendment

right to counsel was violated. In light of the above disposition of this case we find it unnecessary to decide that question. But see: *State v. Atherton,* 242 Or 621, 410 P2d 208, cert. den. 384 US 1025 (1966); *State v. Sanford,* 245 Or 397, 421 P2d 988 (1966); see also *Mathis v. United States,* 391 US 1, 88 S Ct 1503, 20 L ed 2d 381 (1968), holding that *Miranda* rights are applicable to one in custody who is questioned as to an offense entirely separate from the one for which he is held in custody.

The judgment is reversed and the case remanded for a new trial.

PERRY, C. J., dissenting.

It must be kept in mind, in this case we are not concerned with a prophylactic rule to deter police activities, but with the question of the voluntariness of a confession. Therefore, I am unable to agree with the rule of law proposed by the majority that from the "totality of the circumstances surrounding" the giving of the statements by the defendant there exists *"a greater risk of coercion than can be countenanced"* by this court. (Emphasis supplied.) The majority cite for this statement: *Fikes v. Alabama,* 352 US 191, 77 S Ct 281, 1 L ed 2d 246, reh den 352 US 1019, 77 S Ct 553, 1 L ed 2d 561 (1957) and *Clewis v. Texas,* 386 US 707, 87 S Ct 1338, 18 L ed 2d 423 (1967).

This general statement by the majority leaves the courts with a rule as difficult to follow and apply as it would be to follow a platted course with a rudderless ship.

In *Fikes* the facts disclosed the prisoner "was an uneducated Negro, certainly of low mentality, if not mentally ill," and the rule for determining the ques-

tion of voluntariness of a confession, under all of the circumstances, is set forth as follows:

" 'The limits in any case depend upon a weighing of the circumstances of pressure against the power of resistance of the person confessing. What would be overpowering to the weak of will or mind might be utterly ineffective against an experienced criminal.' 346 US, at 185." *Fikes v. Alabama,* supra, 352 US at 197, 198, 1 L ed 2d at 251.

While the above rule is not restated in *Clewis v. Texas,* supra, it is clear the United States Supreme Court applied this rule, for the court there pointed out that the defendant was a Negro with "only a fifth-grade education" and "had apparently never been in trouble with the law before," and whose "faculties" were impaired by inadequate sleep and food, sickness, and long subjection to police custody with little or no contact with anyone other than police.

The issue then is not whether we as individual members of society sitting as judges approve or disapprove of the actions of the police officers. The question presented is whether or not the course of action taken by the police in this case, when properly weighed, was such as to overcome the defendant's power to resist and, therefore, his confession was involuntary. There is not one iota of evidence in this case that the defendant's admission of complicity in the murder was the result of pressure exerted by the police, as will later be established.

Not a single factor relied upon in either *Fikes* or *Clewis* is present in this case. The record before us discloses a defendant apparently of better-than-average intelligence, experienced in criminal activities and the processes involved after arrest and detention. There was no prolonged interrogation of the defend-

ant, or evidence of any psychological pressure of any kind.

Also, I cannot agree with all of the majority's conclusions as to uncontroverted facts. In item No. 2 they point out that after defendant entered his plea of guilty to the robbery charge, the judge found it necessary to make no formal entry at that time on the docket because of defendant's fear of Sipes. It must be noted that the court in this matter relied and acted solely upon the self-serving declarations of the defendant and the urgings of his attorney.

The record in this respect shows that prior to this time the defendant had once before entered a plea of guilty to the robbery charge and was then returned to the Rocky Butte jail where Sipes was also being held. Sometime after the defendant's return to the Rocky Butte jail it was rumored that if Sipes "ever got his hands on him [defendant], he's going to kick his ass," and a prisoner there at that time testified that Sipes stated "he ought to kill anyone that snitched on him he ought to kill them." This same prisoner stated the defendant did not have the reputation of being a "snitch". The record does not disclose whether the defendant had told Sipes he had pleaded guilty or whether Sipes obtained the information through other channels.

Very shortly thereafter defendant's attorney sought to have defendant's guilty plea withdrawn. It was at this time that the representations were made by the defendant and his attorney that the defendant was afraid of Sipes.

Therefore, while it appears that the trial court withheld the docket entry of guilty at this time on the representations of defendant, it also appears to me that the court *knew nothing of an agreement kept by*

*the state that defendant would not have to testify against Sipes.* Also, one gleans from the record that Sipes was interested only in the defendant's not appearing as a witness against him for he thought then he would either not be tried because of a charge against him pending in California, or, if tried, he would be acquitted. Therefore, Sipes' later statement to the officers, after defendant's second appearance and plea of guilty, that they were again on good terms was undoubtedly true.

Contrary to the impression left by item 3 of the majority's opinion on undisputed facts, that only after defendant had entered his plea of guilty were Sipes and defendant placed in different cells, the record clearly shows that at all times, both before and after defendant entered his second plea of guilty, Sipes and defendant were lodged in separate cell blocks. The officer in charge stated that in all instances where two persons were arrested for the same crime their policy was to keep these parties separated. This testimony of the officer is uncontradicted.

· The statement of the majority as to item 8 leaves the impression that neither the officers or Sipes were anxious to have Sipes present when they interviewed Atkins. The record shows that Sipes was present "At Mr. Atkins' request," not at Sipes' request or the request of the officers.

It must also be kept in mind that the detectives never once requested Sipes to try and obtain a confession from the defendant, but only to find out if possible the whereabouts of the gun used in the murder. This alone was the purpose of putting the two together in the county jail in the courthouse.

Also, the following testimony of the defendant as to what occurred in the jail in the courthouse, where

defendant and Sipes were together, should be taken into consideration when evaluating this record:

"A  Well, I was in the cell next to him—there was a partition between us—and we had conversation.

"Q  And what did—what were these conversations?

"A  Well, he wanted me to give a statement about the murder and he said that I could get life for armed robbery and I could get life for murder so it didn't make any difference. *He said if I would make a statement on the murder, that they would drop the armed robbery on him and let him go to California on this charge and so he said it shouldn't make any difference to me one way or the other.*

"Q  And did he advise you that he felt confident he would beat the armed robbery in California?

"A  *Yes, he said he was very confident he would beat it.*

"Q  Did you agree to this, Mr. Atkins?
"A  No, I didn't.

"Q  All right. And how many days were you separated with just the partition between you?
"A  For three days.

"*    *    *    *    *

"A  Well, when we were in the same cell, at first—the first day he was real nice and he was—tried to get me—give me cigarettes and things, and I told him that I knew what he was trying to do and I wasn't going for it, and on the second day he started getting pretty mad. He didn't do anything that day; he just threatened to. And then the third day he told me that—he said, 'Either you're going to do it today, buster, or I'm going to beat the hell out of you,' and I said, 'You're just going to have to do it, John, because I'm not going down there and say something that I didn't do,' and then he started slapping me around that evening, and

he came into my cell about three o'clock in the morning and he told me, he said, 'Either you're going to do it or you ain't going to live until tomorrow,' so I told him that I would do it." (Emphasis supplied)

Of course, both the defendant and Sipes testified at the *in camera* hearing that Sipes slapped defendant around and threatened his life if he didn't confess to this brutal murder, and defendant testified that if he hadn't been afraid of Sipes he would never have confessed.

The testimony of both defendant and Sipes in this respect is clearly unworthy of belief. Sipes testified when he slapped the defendant around the defendant complained to the jailer. The jailer testified there was no disturbance in the cell and defendant never made any complaint about Sipes' conduct or his fear of Sipes.

The clincher, however, is the fact that when the defendant met Mr. Tamblyn on his way to meet the police officers and make his statements, this attorney and defendant together went by themselves into the attorney's interviewing room and conferred, and according to Mr. Tamblyn defendant at this time never once mentioned Sipes.

In my mind, this court is overstepping the boundary limitations imposed upon it by Article VII, § 3 of the Oregon Constitution when it attempts to interpose its own findings of fact for those of the trial judge.

Also, when the so-called uncontroverted facts found by the majority are placed in proper perspective, it becomes quite clear that the judge who heard and saw the witnesses reached the correct conclusions when he

found that the admissions of the defendant were voluntary and admitted them in evidence.

The uncontroverted facts show, first, that the officers had never attempted to pressure the defendant into admissions of guilt; second, that the sole reason Sipes wanted defendant to confess was not the request of the police, but for Sipes' benefit; and third, that while Sipes conjured up in his own mind the belief that if defendant confessed he would be benefited, such a belief was only a figment of his imagination born of his wishes.

For the reasons above set out, I dissent. I would sustain the judgment rendered.

Justices McALLISTER and GOODWIN join in this dissent.