Argued April 21, affirmed May 28, petition for review
denied July 14, 1971

In the Matter of Michael Jerome Patterson,
a Child.

## STATE OF OREGON, *Respondent, v.*
## MICHAEL JEROME PATTERSON, *Appellant.*

485 P2d 429

*Richard H. Muller*, Portland, argued the cause for appellant. On the brief were William L. Richardson, Tamblyn, Bouneff, Muller, Marshall & Richardson, Portland.

*Thomas H. Denney*, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and Jacob B. Tanzer, Solicitor General, Salem.

Before SCHWAB, Chief Judge, and LANGTRY and FOLEY, Judges.

LANGTRY, J.

This appeal is from a juvenile court judgment on a murder charge contained in a juvenile court petition and order of commitment to the Corrections

Division for placement in MacLaren School for Boys made on May 11, 1970. The record before us shows three petitions, alleging Michael Patterson to be within the jurisdiction of the court, which were filed pursuant to ORS 419.476 (1) (a). The first, filed March 13, 1970, alleged that the 15-year-old boy had committed burglary in a dwelling and grand larceny. The second, filed March 17, 1970, alleged that he had committed murder in the first degree. The third, filed March 23, 1970, charged the burglary, referred to as the Melrose burglary, and grand larceny, already alleged in the petition of March 13, as well as two other burglaries and charges of grand larceny. The first petition appears to have been abandoned in favor of the third.

After a hearing on the third petition, held before Judge Carl A. Dahl of the juvenile court on April 20, 1970, the court found beyond a reasonable doubt that the defendant had committed the three burglaries. The dispositional phase of the matter, except an order which made the boy a ward of the court, was postponed until a later date. The record shows no appeal taken from the finding of wardship and we have no transcript of the hearing. On May 11, 1970, Judge Harlow F. Lenon of the juvenile court, held a hearing on the second petition—the one charging murder—and at its conclusion found that the allegations thereof had been established beyond a reasonable doubt. Judge Lenon continued the boy as a ward of the court and made the disposition judgment from which this appeal was taken. Vigorous defense representation was accorded at the second hearing by the same appointed attorney who had represented the boy at the first hearing.

Before the court announced its judgment in open court, the judge said to the boy's attorney:

"Mr. Richardson, do you understand that the disposition is to be made with respect to both his [Judge Dahl's] order and this order?

"MR. RICHARDSON: That was my impression from the last hearing, your Honor.

"THE COURT: Is Michael now a ward?

"MR. COPP: [The boy's Juvenile Court Counselor.] Yes, he is, your Honor."

We note from the above, before discussing the alleged errors in the proceedings before Judge Lenon, that if we agreed that any such errors occurred the order of commitment is nevertheless valid because it is based upon valid findings of burglary from which appeal was not taken, as well as the first-degree murder finding.

The errors alleged are that (1) the original arrest was illegal and consequently all subsequent statements were inadmissible; (2) the statements were inadmissible because they were taken in violation of the Fifth, Sixth and Fourteenth Amendments of the U. S. Constitution and were not voluntary; and (3) request for a jury trial should not have been denied.

Michael Patterson was apprehended by Officer Kanzler at approximately 11 o'clock at night on a street in Portland. Kanzler testified that he saw the boy, with others, on the street; that he knew from assertions to him of other boys he had recently arrested for the same crime that this boy was one who had committed the Melrose burglary. When Kanzler sought to apprehend him the boy ran. He circled several blocks in his patrol car before the apprehension was accomplished, "because he kept running." The

officer testified that he advised the boy "I was placing him under arrest in the car." Later the boy denied that he was so advised. After they arrived at the police station Kanzler testified that he advised the boy of his *Miranda*[①] rights in detail by reading them from a card and explaining them. No questions had been asked on the way, or information given. The boy, with reference to the *Miranda* advice, testified:

"Q Did you hear Officer Kanzler here in court read off those constitutional rights?
"A Yes.

"Q Did you understand those?
"A When he just said them to me?

"Q Yes.
"A Yes.
"* * * * *

"Q Did you want to hire a lawyer?
"A I didn't know at the time.

"Q Did you see any of your relatives that day?
"A No. I seen my father the next morning.

"Q Were you afraid?
"A Afraid of what?

"Q Afraid of the police officers.
"A Nope.

"Q Afraid of anybody?
"A Nope.
"* * * * *

"Q Do you know what it means when somebody says they will appoint you a lawyer?
"A Uh-huh.

"Q What does it mean?
"A It means that they will get a lawyer and you can talk him, something like that. I know a little bit about it, not much.

---

① *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974 (1966).

"Q Do you know what it means that the Court will appoint a lawyer?

"A Uh-huh.

"Q And what does it mean?

"A It means my counselor will go out and get me a lawyer if I can't afford one.

"Q Did you talk to your counseler [sic] that day?

"A The day I got picked up?

"Q Yes.

"A No.

"Q When was the first time you saw your counselor?

"A The next morning.

"\* \* \* \* \*

"Q You talked to Officer Kanzler about the burglaries, right?

"A Yes, one.

"Q Do you know that you didn't have to discuss those burglaries with him if you didn't want to?

"A Uh-uh.

"\* \* \* \* \*

"THE COURT: Then what is all this talk about? When a policeman talks to you, do you have to answer?

"A You don't have to.

"\* \* \* \* \*

"THE COURT: How do you know you didn't have to answer?

"A I just wanted to talk to him.

"THE COURT: When I talk to you now, you have to answer, don't you?

"A Yes.

"THE COURT: When Mr. Kanzler talked to you, you didn't have to answer him.

"A No.

"THE COURT: You knew you didn't have to answer him?

"A   I didn't know I had to answer him.

"THE COURT: You thought you didn't have to answer him; is that right?

"A   Yes—trying to get me confused, aren't you?

"THE COURT: As a matter of fact, I am trying to protect you. Your interests rather than otherwise."

██  ██  From the foregoing we cannot but agree with the trial court that the boy was adequately advised of his rights and that he understood them. Furthermore, Kanzler's testimony and the boy's actions indicate that the officer had reasonable grounds to believe that the boy was one who had committed the Melrose burglary. Regardless of whether he was advised he was under arrest, the fact that the officer placed him in the patrol car and took him to the police station is evidence enough of an arrest. ORS 133.310(3) requires only that an officer know that a felony has been committed, and have reasonable grounds to believe defendant did it to make the arrest. The arrest was valid.

██  ██  After the advice of rights, Kanzler testified that the boy talked "freely" of the burglary. He said he had taken a rifle, among other things. Before midnight the boy was placed in the juvenile unit of the city detention facility for the night; Kanzler wrote up his report, and as he left, on his way through the juvenile unit, the boy called him back. He volunteered, "I know where there is a dead guy." Then, in additional volunteered statements, the boy described the place where a dead man was in a blue car with the back window broken in the area where Kanzler had pursued the boy. Kanzler remembered having seen a car

with a broken back window during the pursuit. He immediately went to that place, investigated and found that there was, indeed, such a car with a slain man in it. This was the first information the police had of the slaying. There was no connection, so far as the police were concerned, between the arrest for burglary and the volunteered information. In this respect, the situation was much different than that in *State v. Jones*, 248 Or 428, 435 P2d 317 (1967), relied upon by the boy, where the arrest was not only illegal, but the admissions made by the defendant were in answer to questions about a crime the police learned about from independent sources after the defendant's arrest.

During the next three or four hours the boy was subjected to two interrogations, apparently neither over an hour in length, by detectives. Kanzler testified, and his actions indicate, that when he found the slain man he believed the boy had simply been a witness to a murder. This is what the detectives started with. As the detectives sought information from the boy, and received increasingly fanciful answers, evidence indicates that they suspected the boy knew more than he was telling. One testified, however, "I treated him as a witness [to the crime] the whole morning . . . ." The boy at one point said his cousin had been with him when he witnessed the shooting. The detectives went for and brought this cousin and his mother, the boy's aunt, who listened as the cousin denied any knowledge of the murder.

The detectives took the boy to the scene and had him point out locations of things he had seen. At about 4:00 a.m. a written statement, on a form which recites the *Miranda* rights, was typed up and signed by the boy. It was exculpatory. The detective who

took the statement testified he read the *Miranda* warnings to the boy, that the boy did not ask to talk with his father or a lawyer, and was cooperative. The boy agreed that he did not ask for any such counsel. It appears that the father was at the police station, unknown to the detectives, although he testified he told someone he wanted to see the boy. The detectives had sent word of the arrest to the father, who had no telephone, through an uncle.

At about 4:00 a.m. the boy was put back into the juvenile unit and was transported to the juvenile detention home around 8:00 or 9:00 a.m. At about 10:30 a.m. he had a preliminary hearing at the detention home in juvenile court. There he was again told his rights, saw his father, and a juvenile counselor was appointed and instructed to get him an appointed lawyer. His father testified he told his counselor not to let him talk to police without the counselor present.

Kanzler again talked to the boy at about 12:45 p.m. that day. He testified:

"Q  Now, he did indicate he didn't want to talk to you until his counselor arrived?

"A  No. He said, 'I would like to have my counselor here,' and I said, 'Fine,' and then he stated, 'Well, I will just talk here after all.'

"Q  * * * [I]n the advising of his rights you said, 'You can get a lawyer through your counselor or the Court.'

"A  Yes, I did."

The boy's story changed, but continued fanciful. A day later another detective talked with him at the detention home. He testified that the boy was again advised of his rights, but that he was willing to talk. This time, the boy's story changed to include

admissions that he provided to others the rifle he had taken in the Melrose burglary, and was present when it was used in a robbery, and that one of the group, using the rifle, shot and killed the man in the car.

A lawyer could have warned the boy that the final story could implicate him as a principal to murder. However, this doesn't change the voluntariness of the statement, or indicate it was obtained in violation of the boy's constitutional rights. The boy was 15, demonstrated as a witness that he could read and readily understand what he was reading, was in the eighth grade when he had dropped out of school, understood his rights, and certainly was sophisticated in the culture of crime. The circumstances related above are not a complete statement of all of what occurred, but they are supportive of the trial judge's findings. After a complete review of the record we cannot disagree with the trial court's remarks or rulings:

"THE COURT: There is a distinction between several interrogations and continued interrogations; and the Court finds here several interrogations.

"* * * [They] were not continually repeated or overwhelming in their character.

"There is also a distinction between a voluntary statement and voluntariness in a statement given in response to interrogation. The Court finds here that the initial information that is relevant * * * to this case was in the nature of a voluntary statement rather than a voluntary response to interrogation.

"* * * * *

"The Court finds here no evidence of police misconduct.

"The Court further believes that it is appropriate for a police officer * * * to be persistent in

investigation if there isn't overwhelming persistence in interrogation. The Court finds here persistence in investigation but not unconstitutional persistence in interrogation."

Our review of the record leads us to the same conclusions. See *State v. Atkins*, 251 Or 485, 496-97, 446 P2d 660 (1968), and *State v. Gullings*, 244 Or 173, 182, 416 P2d 311 (1966), where the court said:

"* * * It can not be said that a juvenile can not waive constitutional rights as a matter of law. It may be more difficult to prove because of his age, but it is a factual matter to be decided by the trial judge in each case."

See also *State v. Williams*, 1 Or App 30, 458 P2d 699 (1969).

The trial court did not discuss the failure of the juvenile detention staff to follow the father's instructions not to allow the boy to talk with police without his counselor present. No instruction was given against talking without an attorney for the boy present. There is a decided difference between having a juvenile court counselor or an attorney present.

In arriving at our conclusion we have considered the failure to follow the father's instruction. Whether statements made by juveniles or adults are admissible against them depends upon the facts and circumstances of each case, measured by the constitutional safeguards interpreted in *Miranda*. Where a juvenile is involved the wishes of the parents are to be considered, but they are not the only consideration. In this case, the circumstances shown by the record disclose that the boy was knowledgeable, not pressured, and told what he voluntarily wanted to tell.

In *State v. Turner*, 253 Or 235, 453 P2d 910 (1969), it was held that jury trials are not required in juvenile proceedings.

Affirmed.