Vincent EBEN, Appellant,

v.

STATE of Alaska, Appellee.

No. 3525.

Supreme Court of Alaska.

Sept. 7, 1979.

Dana Fabe, Asst. Public Defender, Brian Shortell, Public Defender, Anchorage, for appellant.

John A. Scukanec, Asst. Dist. Atty., Joseph D. Balfe, Dist. Atty., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.

## OPINION

RABINOWITZ, Chief Justice.

After trial by jury Vincent Eben was found guilty of two counts of second degree

murder.[1] The only significant issue litigated at trial was the extent of Eben's culpability and legal responsibility for his parents' deaths.

The evidence produced at trial showed the following. On the afternoon of December 6, 1976, Vincent Eben went to a bar to shoot pool and drink beer. At about 6 p. m. that evening, Eben called his friend, Cecelia, and told her to meet him at the Elbow Room bar because he was drunk and wanted her to be with him. When Cecelia arrived at the Elbow Room at about 7:30 p. m., Vincent appeared to her to be drunk. Throughout the evening and until about 4:30 the next morning, Eben drank continuously.[2]

At about 4:30 a. m., Eben and Cecelia took a cab to the family apartment. Cecelia testified that she had to assist him because he was drunk and "kind of staggering."[3] They arrived at the apartment a little before 5 a. m., December 7, 1976.

Vincent Eben took off his coat and shoes, went to the kitchen and ate some spareribs. He initiated an argument with Cecelia, became angry, and slapped her once in the face. She went to the bathroom to clean her face. When she returned to the kitchen, his expression had changed. He was quiet, but his muscles were "all tensed up" and his eyes were open wide and had a "wild look" in them.

Eben then said "something about his mom and dad always wanted to die," opened a kitchen drawer, pulled out a knife, and started walking toward his parents' bedroom. Cecelia attempted to stop him, but he pushed her to the floor. This struggle and Cecelia's screaming awakened Eben's two sisters. His sister Charlotte came out of her room and attempted to stop him, but he hit her in the stomach with his hand and the knife handle and proceeded into his parents' room. He stabbed his father, Francis, once in the chest, and his mother, Rebecca, three times in the back, killing them both.

Vincent emerged from the room and threw down the knife, which stuck in the floor. He walked down the hall to the living room and sat on the couch. Charlotte called the police.

Anchorage Police Officers Loy and Haakenson were only a half block away when they received the dispatcher's call and arrived at the Eben apartment shortly after the stabbings had occurred. The three young women were "very excited and yelling." Charlotte pointed down the hall and stated: "[H]e just stabbed my mom and dad." The police officers saw Eben standing in the hall without a shirt or shoes or socks. At this time, Eben made a statement which one of the officers summarized as follows:

> [T]hey wanted to go to hell so I sent them there, I stabbed them. You better get an ambulance, . . . I stabbed them bad.

Eben then turned around and held his hands behind his back in what the officers described to be a "handcuffing position."

While Officer Loy investigated the parents' room, Officer Haakenson attempted to advise Eben of his rights, but Eben interrupted him, shouting that he knew his rights. Haakenson shortly thereafter took Eben outside to transport him to the police station.[4]

Haakenson testified that he detected a moderate odor of alcohol on Eben's breath. Both officers testified that Eben was not

---

1. Eben was sentenced to fifteen years imprisonment on each count. The sentences were to run concurrently with Eben eligible for parole after serving five years of the sentence.

2. Eben told Cecelia to leave at about 3 a. m. She went to the Montana Club for a half hour or an hour and then returned to Eben at the Elbow Room.

3. The bartender at the Elbow Room that night testified that Eben was "not too sober" when he left, but that he had seen Eben "more intoxicated." However, the bartender's testimony was less than consistent, and the prosecutor stipulated that this witness was under the influence of alcohol as he testified.

4. Haakenson testified that he was in the apartment about eight minutes in all.

greatly intoxicated and did not seem much impaired in either speech or movement.[5]

Haakenson and Eben arrived at the police station at about 5:30 a. m. and went to an "interview room," where Eben's handcuffs were removed. Haakenson read Eben his rights from a standard *Miranda* rights advisement form, and Eben replied that he understood each of these rights. The officer pushed the rights waiver form across the table for Eben to read. As Eben started to pick it up, he observed the blood on his hands and became "quite upset at the sight of the blood asking where did this blood come from." Eben was "visibly shaking . . . . [H]e seemed to be very tense and his arms were shaking and his voice began to rise again." Officer Haakenson further testified:

> [I] advised him at that time that if he did not calm down that I would have to put the handcuffs back on him. He seemed to calm down considerably, however he began to spit on his hands and wipe the blood off on his pants.

Eben refused to sign the rights form, stating that he wished to speak to a lawyer and wanted a court-appointed lawyer. Officer Haakenson did not call the public defender agency at that time because he was not aware that they could be reached at night and he "did not have the number handy."

Soon thereafter, Officer McCollum joined Officer Haakenson in the room with Eben. McCollum told Haakenson that he knew Eben and that Eben might talk more freely with him. Eben recognized McCollum, greeted him by his first name, and asked him for a cigarette.

The police officers then once more advised Eben of his rights. Eben told them that he would sign the rights waiver form after he talked to Cecelia, who had remained at the family apartment. He gave the officers the phone number. One of them dialed it for him and asked a police sergeant at the apartment to bring Cecelia to the phone. The officers remained in the room during Eben's conversation with Cecelia.[6] At no time to this point had Eben indicated that he was willing to talk to the police officers and answer their questions. After the phone call, Eben again refused to sign the waiver form.

Eben was then taken to the jail and placed in a "detox" unit at about 6 a. m. Correctional Officer Strutko testified at trial that, over the monitoring microphones, he heard Eben yelling to Eben's brother Owen, who was also in jail. He quoted Eben as saying: "Hey, I just killed mom and dad."

Prior to the trial, Eben's counsel sought a protective order prohibiting Officers McCollum and Haakenson from testifying regarding admissions which they claimed Eben made during the phone call from the police station to Cecelia. After a full hearing on this motion, it was denied by the superior court.[7]

The prosecution and defense presented widely conflicting testimony as to the degree of intoxication from which Eben was

---

5. Loy's observations were based on only a few minutes with Eben in the apartment. Haakenson took Eben to the station, while Loy remained at the apartment.

6. Officer McCollum evidently left the room for a short period and did not overhear the entire conversation.

7. At trial, Officer Haakenson testified as to Eben's statements during the call to Cecelia:
 I can't state the exact words . . .

 . . . . . .

 He stated that they both wanted to go to hell so he had sent them there, and also that he didn't feel his father would live because he had stabbed the knife far enough into his

father's heart that he didn't think he would—would live. He also said that—he said I hope they're both dead and he—and I'll meet them in hell.

. . . . . .

. . . [H]e stated that he wasn't afraid of the establishment and he could take anything that they could give him. He also, during the phone conversation, made some mention that he felt that—that he would be executed in some form. I believe it was either the electric chair or firing squad but I don't remember which, for what he had done.

Officer McCollum corroborated some of this testimony.

suffering at the time of the stabbing and in the hours that followed. The testimony of the law enforcement officials portrayed Eben as smelling moderately of alcohol and abusive in manner, but not severely intoxicated or impaired in speech, balance, or movement. In contrast, and in addition to Cecelia's testimony that Eben was very drunk, defense witnesses who saw him from four to seven hours after the stabbing testified that Eben's breath smelled strongly of alcohol and estimated from his demeanor that he must have been very intoxicated at the time of the stabbings.

At the conclusion of the prosecution's case in chief, Eben's attorney moved for a judgment of acquittal of first degree murder on both counts. The superior court granted this motion only as to the killing of Eben's mother, Rebecca. The court again denied a similar motion with respect to acquittal of the charge of first degree murder of Eben's father, Francis, made after all evidence had been presented to the jury. As indicated previously, the jury returned unanimous verdicts of guilty of second degree murder on both counts.

■ We first address Eben's argument that the superior court erred in denying his motion for a judgment of acquittal on the charge of first degree murder of Francis Eben. The applicable standard which this court employs on review is the same as that used by the trial courts in ruling on such motions:

> On a motion for a judgment of acquittal the judge must take the view of the evidence and the inferences therefrom most favorable to the state. If he deter-

mines that fair minded men in the exercise of reasonable judgment could differ on the question of whether guilt has been established beyond a reasonable doubt, then he must submit the case to the jury.[8]

As Eben's brief argues, the effective difference between first and second degree murder for the purposes of analyzing the superior court's ruling is that sufficient evidence of "premeditation" and "deliberation" must be presented to warrant submission of a charge of first degree murder to the jury. The jury instructions in this case summarized the definitions of these terms:

> "Deliberate" means that the act was not the result of a sudden impulse; that some thought and consideration was given by the defendant before arriving at the purpose or intent to kill. "Premeditated" means that a deliberate thought process was used; that the purpose to kill was turned over in the defendant's mind and that a decision to kill was made prior to the commission of the act.[9]

The trial court specifically noted the evidence that Eben had threatened to kill his father because of "verbal attacks on his girlfriend," which a jury might see as evidence of "a very deep smoldering conflict or hatred . . . between the defendant and his father." The court also relied upon evidence that Eben deliberately went to his father to kill him first.[10] In addition to the threats and hostility in evidence between Eben and his father and the fact that he stabbed his father first, the court noted that there was testimony that Eben felt that he had stabbed his father only once but "far enough into his father's heart that he didn't think he would . . . live."

---

8. *Bush v. State,* 397 P.2d 616, 618 (Alaska 1964) (footnotes omitted). *See also Des Jardins v. State,* 551 P.2d 181, 184 (Alaska 1976); *McCurry v. State,* 538 P.2d 100, 101 (Alaska 1975); *Armstrong v. State,* 502 P. 2d 440, 443 (Alaska 1972).

This standard is relevant whether the evidence presented is direct or wholly circumstantial. *See, e. g., Des Jardins v. State,* 551 P.2d 181, 184 (Alaska 1976).

9. The instructions further defined these necessary mental states, consistently with *Gray v. State,* 463 P.2d 897, 905–06 (Alaska 1970), as

not tested by the "duration of time" of reflection, but requiring a "mind . . . sufficiently composed to reflect upon the killing and to understand the nature and character of the act and its consequences."

10. Eben's sister Charlotte related an incident two to four weeks prior to the killings in which Eben hit his father on the left side of the face. His father was drunk and had called Cecelia "names . . . like slut and prostitute." After he hit his father, he said, according to Charlotte: "If you don't watch out, man, Ill kill you."

■ Eben argues that this court should focus only on the evidence which differentiates the killings of his father and mother in evaluating the merits of the superior court's denial of part of his motion for a judgment of acquittal. However, evidence probative of Eben's *mens rea* common to both killings may properly be considered, if only because the superior court conceivably might have erred in the defendant's favor in granting the motion as to the killing of Eben's mother.

■ The evidence of the fight, the threat, and the order and manner of the killings may have been seen by the superior court as sufficient additional probative evidence of premeditation and deliberation to allow a jury decision as to a first degree murder charge [11] with respect to the killing of Eben's father. However, other evidence probative of these *mens rea* requirements in varying degrees included: the "choice of knives" theory; [12] the fact that Eben walked between 30 and 40 feet to reach his parents after apparently deciding or feeling compelled to act; the fact that Eben ignored the pleas of and fought off both his sister and girlfriend, who attempted to stop or dissuade him; the testimony of his girlfriend that immediately prior to making that walk to effect the stabbings, Eben stated that he was going to kill his parents; the incriminating remarks in the presence of police officers both at the Eben apartment and the police station which revealed his comprehension of the nature and consequences of his actions; and the testimony of police officers that Eben did not appear to be highly intoxicated.

Viewing this evidence common to both killings and that specific to the killing of his father with "the inferences therefrom most favorable to the state," it is our opinion "that fair minded men in the exercise of

reasonable judgment could differ on the question of whether guilt [of first degree murder in the killing of his father] has been established beyond a reasonable doubt." Accordingly, we hold that the superior court did not err in denying Eben's motion for a judgment of acquittal of the charge of first degree murder of Francis Eben.

■ We next turn to Eben's specification of error that the admission of testimony by police officers as to statements made by him in the course of the phone call to Cecelia violated his right to counsel. More specifically, Eben argues that the admission of his statements made during the phone call to Cecelia was a violation of his right to counsel under the sixth amendment of the United States Constitution and article I, section 11 of the Alaska Constitution. In support of this assertion, Eben's brief portrays the actions of the police officers present and the attendant circumstances as effectively amounting to an attempt to "elicit" those statements. Arguing from the United States Supreme Court decisions in *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), he asserts that the evidence should not have been used because "[a]ny subsequent effort by the police to elicit information, no matter how deceptive or indirect, has the same practical effect as interrogation." It is contended that Eben neither had the capacity nor intention to waive his right to counsel, and that the admission of this testimony was prejudicial and requires the reversal of his conviction.

Eben's arguments are not persuasive. First, they purport to be based on the sixth amendment right to counsel rather than fifth amendment *Miranda* counsel rights.[13]

---

11. Immediately after the judge's ruling, Eben's attorney stated that "there is now evidence of premeditation as to Mr. Eben . . . [but as the judge] ruled, properly, I think, . . . no evidence of premeditation as to Mrs. Eben."

12. This theory will be alluded to subsequently in the opinion.

13. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In his reply brief, Eben attempts to distinguish cases raised by the state as dealing "only with Fifth Amendment issues." These are inapplicable, the reply brief argues, because "Vincent Eben is not appealing the admissibility of the calls on Fifth Amendment or voluntariness grounds."

Yet our understanding of this distinction makes it clear that it is *Miranda* and not sixth amendment counsel rights which may be appropriately asserted by Eben with respect to the phone call admissions.

The case most strongly relied on by Eben, *Brewer v. Williams,* makes this distinction. In that case, there was "no doubt . . . that judicial proceedings had been initiated against Williams." A warrant had been issued for his arrest, he had been arraigned on that warrant before a judge with the assistance of counsel, and he had been committed to jail by the court.[14] In this procedural context, the United States Supreme Court held that Williams' sixth amendment right to counsel had attached and had been violated.[15]

At the time Eben made the statements whose admission at trial is challenged here, he had been arrested after a phone call

report to police and had been in police custody for about one-half hour. No formal judicial proceedings had been initiated against him and he had not yet obtained the assistance of counsel. While, as the Supreme Court in *Brewer v. Williams* observed, there is a divergence of judicial opinion as to the "peripheral scope" of the sixth amendment right to counsel, there is little dispute that the formulation in the plurality opinion in *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), defines that right's basic scope.[16] Eben's sixth amendment rights were not implicated under that formulation because no "adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment"—had been initiated against him. 406 U.S. at 689, 92 S.Ct. at 1882, 32 L.Ed.2d at 417.

14. *Brewer v. Williams,* 430 U.S. 387, 399, 97 S.Ct. 1232, 51 L.Ed.2d 424, 436 (1977). In the Massachusetts case relied on by Eben, the defendant had been arrested pursuant to a warrant and had "consulted with two attorneys, having retained the second after discharging the first." *Commonwealth v. Dustin*, 373 Mass. 612, 368 N.E.2d 1388, 1389 (1977), *cert. denied*, 435 U.S. 943, 98 S.Ct. 1523, 55 L.Ed.2d 540 (1978).

15. The Supreme Court thus distinguished a defendant's fifth and sixth amendment rights to counsel:

[T]here is no need to review in this case the doctrine of *Miranda v. Arizona*, a doctrine designed to secure the constitutional privilege against compulsory self-incrimination . . . . For it is clear that the judgment before us must in any event be affirmed upon the ground that Williams was deprived of a different constitutional right—the right to the assistance of counsel.

This right, guaranteed by the Sixth and Fourteenth Amendments, is indispensable to the fair administration of our adversary system of criminal justice. Its vital need at the pretrial stage has perhaps nowhere been more succinctly explained than in Mr. Justice Sutherland's memorable words for the Court 44 years ago in *Powell v. Alabama*, 287 U.S. 45, 57, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527:

"[D]uring perhaps the most critical period of the proceedings against these defendants, that is to say, from the time of their arraignment until the beginning of their trial, when consultation, thoroughgoing investigation

and preparation were vitally important, the defendants did not have the aid of counsel in any real sense, although they were as much entitled to such aid during that period as at the trial itself."

. . . Whatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him—"whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."

430 U.S. at 397–99, 97 S.Ct. at 1239, 51 L.Ed.2d at 435–36 (citations omitted). *See also Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); *United States v. Satterfield*, 558 F.2d 655 (2d Cir. 1976). Many decisions fail to accurately make this distinction. *See, e. g., United States v. Massey*, 437 F.Supp. 843 (M.D.Fla.1978).

The supreme court's decision in *Brewer v. Williams* has been the subject of extensive commentary. The most detailed analysis of that decision is developed in two articles by Professor Kamisar. *See* Kamisar, *Foreword*: Brewer v. Williams—*A Hard Look at a Discomfiting Record*, 66 Geo.L.J. 209 (1977), and Kamisar, Brewer v. Williams, Massiah, *and* Miranda: *What is "Interrogation"? When Does It Matter?*, 67 Geo.L.J. 1 (1978).

16. See note 15 *supra. See also Moore v. Illinois*, 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977).

■ Furthermore, Eben has cited no authority which would extend the sixth amendment right to counsel to the context of this case. Those cases which have directly considered the question have held that such an extension of sixth amendment rights is not warranted.[17] We agree with the reasoning of these decisions and conclude that Eben's sixth amendment right to counsel had not attached at the time of his telephone call to Cecelia. At this stage of the criminal process it is the *Miranda* requirements implementing the fifth amendment privilege against self-incrimination which provide a right to counsel.[18] Therefore, it is by *Miranda* standards that we must review the trial court's decision to admit the police officers' testimony as to statements made by Eben during the telephone conversation.

■ We find no violation of *Miranda* here. *Miranda* requires certain substantive rights and procedural safeguards where a suspect is subjected to "custodial interrogation," which *Miranda* defines as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706 (1966). Both *custody and interrogation* must be involved in the procurement of an inculpatory statement by law enforcement officials before the standards enunciated in *Miranda* are applicable.[19]

■ In this case, it is clear that Eben was "in custody" at the time he made the state-

---

**17.** *See, e. g., Jett v. Castaneda*, 578 F.2d 842, 844 (9th Cir. 1978); *United States v. Duvall*, 537 F.2d 15, 20–22 (2d Cir.), *cert. denied*, 426 U.S. 950, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976); *People v. Wong*, 18 Cal.3d 178, 133 Cal.Rptr. 511, 513–15, 555 P.2d 297, 299–301 (1976); *State v. Stone*, 397 A.2d 989, 996–97 (Me.1979).

The federal district court in *United States v. Miller*, 432 F.Supp. 382, 385–89 (E.D.N.Y.1977), *aff'd without opinion*, 573 F.2d 1297 (2d Cir. 1978), discussed this issue at length and concluded that there were "persuasive reasons" for holding that the defendant's sixth amendment rights had attached during an interrogation conducted after his arrest, but prior to the initiation of formal judicial proceedings. However, in contrast to the present case, "Miller had retained counsel, he indicated that he wished to consult with counsel prior to answering questions, he repeatedly asked when counsel would be present, and prior to questioning counsel had spoken with two F.B.I. agents, directing them not to speak to his client." 432 F.Supp. at 387 (footnote omitted). The *Miller* court's discussion of this sixth amendment question was dicta, as it expressly declined to make a "final determination" of the question and suppressed Miller's statement on fifth amendment grounds. *Id.* at 389.

**18.** We recognized this distinction between fifth and sixth amendment rights in *Ladd v. State*, 568 P.2d 960, 966 n.9 (Alaska 1977), *cert. denied*, 435 U.S. 928, 98 S.Ct. 1498, 55 L.Ed.2d 524 (1978), with specific reference to *Brewer v. Williams*.

*See Jett v. Castaneda*, 578 F.2d 842, 844 (9th Cir. 1978):

The right to counsel during custodial interrogation implements the Fifth Amendment

right against self-incrimination. It does not proceed directly from the Sixth Amendment. *See also Johnson v. New Jersey*, 384 U.S. 719, 729, 86 S.Ct. 1772, 1779, 16 L.Ed.2d 882, 890 (1966) ("prime purpose" of *Miranda* is "to guarantee full effectuation of the privilege against self-incrimination," rather than implement sixth amendment).

Additionally, we find no convincing reasons for extending the right to counsel guaranteed in article I, section 11 of the Alaska Constitution to the factual context presented here. The *Miranda* protections are specifically tailored to the custodial interrogation context. Given those protections, there are, as the California Supreme Court has noted, "compelling policy considerations" against an extension of the right to counsel under either the sixth amendment or the corresponding section of the Alaska Constitution to all custodial interrogations.

Following the commission of a possible crime, it is essential that the police not be unduly hampered in their investigation. Under defendant's proposed extension of [this right to counsel], however, interrogation of suspects could be delayed indefinitely while the officers attempted to locate the suspect's counsel, notify him of the proposed interview, and either obtain his consent thereto or permit his participation therein.

*People v. Wong*, 18 Cal.3d 178, 133 Cal.Rptr. 511, 515, 555 P.2d 297, 301 (1976). *See also State v. Stone*, 397 A.2d 989, 996–97 (Me.1979). *Compare Blue v. State*, 558 P.2d 636, 640–43 (Alaska 1977) (suspect has right to counsel at pre-indictment lineup under Alaska Constitution absent exigent circumstances).

**19.** *See, e. g., People v. Smith*, 475 P.2d 627, 628 (Colo.1970) (en banc).

ments.[20] However, the record reveals no attempt whatsoever by the police officers to interrogate Eben at any time after he asserted his *Miranda* right to counsel. The statements made by Eben during the telephone conversation with Cecelia were not made in response to police interrogation, but were spontaneous, unsolicited and made with an awareness that the officers were present. The superior court, in denying the motion for a protective order, found that:

> There was no evidence of coercion, physical or psychological . . . . There was no prolonged custodial interrogation . . . . There was no deception . . . . [I]t was an open situation . . . . There was no eavesdropping.

While we recognize that "interrogation" may include a wide range of police practices designed to elicit incriminating information,[21] the police officers here appear to have employed no tactics which might be considered tantamount to interrogation.[22]

The United States Supreme Court in *Miranda* made it clear that "volunteered statements" not made in response to "interrogation" may be used as evidence by the prosecution without infringing on fifth amendment guarantees.

> In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

384 U.S. at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726 (footnote omitted). This principle, sometimes termed an exception to the *Miranda* requirements, has been recognized

---

**20.** The state does not dispute the fact that Eben was "in custody." In our recent opinion in *Hunter v. State*, 590 P.2d 888 (Alaska 1979), we delineated an objective, reasonable person test for determining whether a person is "in custody" in the *Miranda* sense.

**21.** Interrogation within the meaning of *Miranda* is certainly not limited to the asking of questions, but includes official conduct of any description which is calculated to, expected to, or likely to elicit incriminating information. *See, e. g., Combs v. Wingo*, 465 F.2d 96 (6th Cir. 1972); *People v. Sanders*, 55 Ill.App.3d 178, 13 Ill.Dec. 186, 190, 370 N.E.2d 1213, 1217 (1977); *State v. Snethen*, 245 N.W.2d 308, 313 (Iowa 1976); *State v. Atkins*, 251 Or. 485, 446 P.2d 660, 662 (1968) (with police knowledge, defendant placed in cell with much larger violent internee who threatened to kill defendant if he did not confess); *State v. Johnson*, 37 Or.App. 209, 586 P.2d 811, 814 (1978); *State v. Innis*, 391 A.2d 1158, 1161 (R.I.1978), *cert. granted*, 440 U.S. 934, 99 S.Ct. 1277, 59 L.Ed.2d 492 (1979); *State v. Travis*, 360 A.2d 548, 551 (R.I. 1976) (statements made in conversation with undercover officer brought to defendant's cell in handcuffs); *State v. Boggs*, 16 Wash.App. 682, 559 P.2d 11, 15 (1977). *See also Kamisar,*

*Brewer v. Williams, Massiah, and Miranda: What Is Interrogation? When Does It Matter?*, 67 Geo.L.J. 1 (1978); Annot., 31 A.L.R.3d 565, 676–96 (1970).

**22.** This further distinguishes *Brewer v. Williams*, 430 U.S. 387, 399–400, 97 S.Ct. 1232, 1240, 51 L.Ed.2d 424, 436–37 (1977) (police detective employed psychological tactics which he admitted were designed to elicit incriminating information and which the court held "tantamount to interrogation"). Eben's reliance on *Commonwealth v. Dustin*, 373 Mass. 612, 368 N.E.2d 1388 (1977), *cert. denied*, 435 U.S. 943, 98 S.Ct. 1523, 55 L.Ed.2d 540 (1978), is based on characterizing that case as involving a "statement absent interrogation." The holding there, however, was clearly based on improper police tactics. Dustin had asserted his rights and obtained counsel. The officer assigned to watch him was asked by Dustin: "If I tell you something about the incident, will I be admitting my guilt?" The officer replied: "You are not on the stand and you are not under oath. You can tell me anything you want to." *Id.* 368 N.E.2d at 1389. The Massachusetts court upheld the trial court's finding that in that context there had been no voluntary and intelligent waiver of rights by Dustin.

and applied in our prior decisions[23] and those of other jurisdictions.[24] As a New York court has said:

> Indeed, it would be illogical to exclude such statements since they are not the subject of objectionable police behavior, and would reward the guileful, boastful, brazen defendant without corresponding benefit to the search for truth or due process of law.[25]

Eben attempts to construe the record to support his argument that his statements resulted from police coercion. However, the superior court concluded that Eben's statements were "made fully and voluntarily without any compelling influ-

ences." We have independently reviewed the record and have considered the "totality of circumstances" surrounding Eben's statements. We find that sufficient evidence in the record supports the superior court's conclusion that the state met its burden of proving by a preponderance of the evidence that Eben's statements were made voluntarily and not in response to official interrogation.[26] Therefore, we hold that the superior court did not err in admitting the testimony as to Eben's statements made during his telephone conversation with Cecelia, as the admission of those statements did not violate Eben's rights under either the fifth or sixth amendments to the United States Constitution.[27]

**23.** *See Padgett v. State*, 590 P.2d 432, 436 (Alaska 1979); *Ladd v. State*, 568 P.2d 960, 966–67 (Alaska 1977), *cert. denied*, 435 U.S. 928, 98 S.Ct. 1498, 55 L.Ed.2d 524 (1978); *Morris v. State*, 473 P.2d 603, 605–06 (Alaska 1970); *Soolook v. State*, 447 P.2d 55, 60–61 (Alaska 1968), *cert. denied*, 396 U.S. 850, 90 S.Ct. 107, 24 L.Ed.2d 99 (1969).

**24.** *See, e. g., United States v. McCormick*, 565 F.2d 286, 289 n.4 (4th Cir. 1977), *cert. denied*, 434 U.S. 1021, 98 S.Ct. 747, 54 L.Ed.2d 769 (1978); *United States v. Gaynor*, 472 F.2d 899, 899–900 (2d Cir. 1973); *United States v. Massey*, 437 F.Supp. 843, 849 (M.D.Fla.1977); *People v. Patterson*, 88 Cal.App.3d 742, 152 Cal. Rptr. 183, 187 (1979); *State v. Peabody*, 320 A.2d 242, 245 (Me.1974) (statements made during conversation with third party in officer's presence); *Commonwealth v. Myers*, 481 Pa. 217, 392 A.2d 685, 687 (1978); *State v. Guerrero*, 29 Utah 2d 243, 507 P.2d 1029, 1030 (1973); *State v. Miner*, 22 Wash.App. 480, 591 P.2d 812, 815 (1979).

**25.** *People v. Ellis*, 91 Misc.2d 28, 397 N.Y.S.2d 541, 548 (Sup.Ct.Crim.Term.1977).

**26.** In determining whether a confession is voluntary or is the 'product of a mind overborne by coercion,' this court has previously stated that it will consider the 'totality of circumstances surrounding the confession' and conduct an independent review of the record. *Sprague v. State*, 590 P.2d 410, 413 (Alaska 1979) (footnote omitted). *See also Ladd v. State*, 568 P.2d 960, 967 (Alaska 1977), *cert. denied*, 435 U.S. 928, 98 S.Ct. 1498, 55 L.Ed.2d 524 (1978); *Schade v. State*, 512 P.2d 907, 916–17 (Alaska 1973). The trial court properly considered the evidence as to Eben's level of intoxication as a factor to be weighed in determining the voluntariness of his statements. *See Schade v. State*, 512 P.2d at 916–17 (men-

tal illness a factor in determination of voluntariness). *See also State v. Wilson*, 264 N.W.2d 614, 614–15 (Iowa 1978) (influence of drugs a factor); *State v. Snethen*, 245 N.W.2d 308, 315 (Iowa 1976) (mental abnormality a factor); *Yarborough v. Commonwealth*, 217 Va. 971, 234 S.E.2d 286, 289 (1977) (intoxication a factor). *Cf., Hampton v. State*, 569 P.2d 138, 141–44 (Alaska 1977), *cert. denied*, 434 U.S. 1056, 98 S.Ct. 1225, 55 L.Ed.2d 757 (1978); *Thessen v. State*, 454 P.2d 341, 344–46 (Alaska 1969), *cert. denied*, 396 U.S. 1029, 90 S.Ct. 588, 24 L.Ed.2d 525 (1970) (both cases recognizing intoxication or influence of drugs as simply a factor in determination of whether *Miranda* rights waived).

The federal constitutional standard requires that the prosecution prove voluntariness by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618, 627 (1972). We have employed this standard on review in previous cases and Eben has not argued for the adoption of a higher standard as a matter of state constitutional law. *See Sprague v. State*, 590 P.2d at 413 n.7; *Schade v. State*, 512 P.2d at 917.

**27.** Because Eben's statements were not the result of official interrogation, his *Miranda* rights were not implicated and there is no need to determine whether Eben waived his *Miranda* right to counsel, which he had expressly asserted. *See, e. g., Ladd v. State*, 568 P.2d 960, 966 (Alaska 1977), *cert. denied*, 435 U.S. 928, 98 S.Ct. 1498, 55 L.Ed.2d 524 (1978); *Tarnef v. State*, 512 P.2d 923, 934–36 (Alaska 1973) (discussing standard for waiver of *Miranda* rights). Even in the absence of such a waiver, *Miranda* requires only that "[i]f the individual states that he wants an attorney, *the interrogation must cease* until an attorney is present." *Miranda v. Arizona*, 384 U.S. 436, 474, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694, 723 (1966) (empha-

Eben's two remaining specifications of error will be briefly addressed. First, Eben contends that error was committed by the superior court in admitting into evidence four knives which constituted Exhibit 14. The state at trial advanced the theory that these four knives were in the same drawer as the weapon Eben used to stab his parents, and that he "chose" the knife used in the killings as the most "appropriate" murder weapon. This "choice," the state argued, was probative of Eben's mental state at the time of the crime. Eben's attorney objected to the admission of the four knives because "an inadequate foundation for admission . . . was laid . . . [making the knives] a piece of evidence

that's unduly prejudicial and not very probative. . . ." The superior court admitted the exhibit containing the four knives because they were found in the kitchen area, and because Charlotte Eben's testimony indicated that she thought they were all in the same drawer. The superior court concluded that the jury should be allowed to consider this exhibit and the state's choice of knives theory.

 A trial judge's ruling on the admissibility of evidence "should be reversed only upon a showing of a clear abuse of discretion." *Newsom v. State*, 533 P.2d 904, 908 (Alaska 1975). We have concluded that the superior court did not clearly abuse its discretion in admitting the questioned

sis added). For the same reason, there is no need to decide whether Eben waived his right to remain silent. *See Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (federal standard for waiver of right to remain silent); *Miranda v. Arizona*, 384 U.S. at 473–74, 86 S.Ct. at 1627, 16 L.Ed.2d at 723 ("If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, *the interrogation must cease*.") (emphasis added). *See also* Comment, *Reinterrogation of the Silent Suspect: Another Look at the Miranda Doctrine*, 62 Iowa L.Rev. 291 (1976).

After briefing was completed, counsel for Eben filed a "Notice of Additional Authority" which, in part, cited the provisions of AS 12.-25.150(b) and (c), which provide:

(b) Immediately after an arrest, a prisoner shall have the right to telephone or otherwise communicate with his attorney and any relative or friend, and any attorney at law entitled to practice in the courts of Alaska shall, at the request of the prisoner, or any relative or friends of the prisoner, have the right to immediately visit the person arrested.

(c) It shall be unlawful for any officer having custody of a person so arrested to wilfully refuse or neglect to grant any prisoner the rights provided by this section. A violation of this section is a misdemeanor, and, upon conviction, the offender is punishable by a fine of not more than $100, or by imprisonment for not more than 30 days, or by both.

In light of these provisions, Eben argues that the police officers did not provide him with any privacy during his phone call to Cecelia, and thus he was forced to elect between his statutory right to place a phone call to a friend and his constitutional right to remain silent and to have an attorney present during questioning.

Relying on *State, Dep't of Public Safety v. Held*, 246 N.W.2d 863 (Minn.1976), Eben urges

this court to adopt a per se rule against use of any statements made during such a telephone conversation which is overheard by the police. However, *Held* was concerned with implementing a Minnesota statute providing that a detainee should be allowed "a private interview at the place of custody" to consult with his or her attorney. To implement this provision, the Minnesota Supreme Court adopted a per se rule that accounts of a detainee's phone conversation with his or her attorney, as overheard by officers at the place of custody, would not be admitted as evidence at trial. *See also State, Dep't of Public Safety v. Kneisl*, 251 N.W.2d 645 (Minn.1977).

In contrast, the Alaska statute on which Eben relies is not concerned with implementing an arrestee's right to consult privately with his or her attorney, but with the right to contact an attorney, relative or friend for the purpose of arranging for bail or legal representation. It is not contemplated that during such a phone call an arrestee should or will make incriminating statements concerning the offense for which he or she was arrested. The attorney consultation context in *Held* implicates the sixth amendment right to counsel, since it is necessary to the full implementation of that right that a defendant be allowed the privacy necessary to full and free consultation with his or her attorney. No such interest is implicated on the facts presented here.

In light of the potential security problems involved and variations in physical settings, we decline to adopt the per se rule urged by appellant. Nevertheless, we caution that to the extent deemed appropriate in light of the circumstances, law enforcement officials should administer AS 12.25.150(b) in a manner which will permit a prisoner to communicate in privacy with his attorney, relative, or friend.

knives. In so holding, we reject Eben's contention that the state failed to authenticate properly the four knives when offering them in evidence. In the context of this case, the state need only have shown as a matter of reasonable certainty that the four knives were kitchen knives removed from the Eben apartment.

Once this threshold requirement of authentication was met, Charlotte's testimony that she thought the knives were all in the same kitchen drawer was evidence sufficient to support a finding by the jury to that effect. Although not conclusive, there was sufficient testimony in the record from which the superior court could have concluded that the knives had been sufficiently authenticated to allow the jury to consider them as evidence in support of the state's case.[28]

 This holding is also reflective of our rejection of Eben's further argument that the four knives were improperly admitted because their probative value was out-weighed by the danger of "unfair prejudice, confusion of the issues, or misleading the jury" which was presented by their admission into evidence. Rule 403 of the now effective Alaska Rules of Evidence provides:

Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.[29]

This rule provides that admission or exclusion of evidence is a question for the trial judge after weighing its probative value against the countervailing concerns. The record shows that the superior court engaged in this balancing process and concluded that the knives should be admitted.[30] Although the probative value of the four knives may have been slight, the only allegations of prejudice made by Eben reflect a concern that the jury might misestimate their probative value.[31]

28. Alaska's requirements as to authentification are codified in Rule 901 of the Alaska Rules of Evidence, which became effective August 1, 1979. That rule provides:

(a) *General provision.* The requirement of authentification or identification as condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims, except as provided in paragraphs (1) and (2) below:

(1) Whenever the prosecution in a criminal trial offers (A) real evidence which is of such a nature as not to be readily identifiable, or as to be susceptible to adulteration, contamination, modification, tampering, or other changes in form attributable to accident, carelessness, error or fraud, or (B) testimony describing real evidence of the type set forth in (A) if the information on which the description is based was acquired while the evidence was in the custody or control of the prosecution, the prosecution must first demonstrate as a matter of reasonable certainty that the evidence is at the time of trial or was at the time it was observed properly identified and free of the possible taints identified by this paragraph.

(2) In any case in which real evidence of the kind described in subparagraph (1) of this subdivision is offered, the court may require additional proof before deciding whether to admit or exclude evidence under Rule 403.

In this case, Charlotte Eben provided uncertain testimony as to whether the knives offered in evidence were the same as those removed from the Eben apartment. The trial judge required the state to offer Wayne Eben's testimony concerning the removal of the knives from the apartment in order to provide the reasonable certainty necessary to authenticate this real evidence.

29. The rule merely codifies existing Alaska law. *See, e. g., Eubanks v. State*, 516 P.2d 726, 729 (Alaska 1973); *Lewis v. State*, 469 P.2d 689, 696 (Alaska 1970); *Love v. State*, 457 P.2d 622 (Alaska 1969).

30. The superior court's ruling is consistent with the elaboration provided in the commentary to Rule 403.

If the balance between probative value and prejudicial effect (signifying all of the factors discussed in this Rule) is close, the Judge should probably decide to admit the evidence. In other words, there is a slight presumption in favor of admitting relevant evidence. In order to overcome this minimal presumption, the prejudicial effect must be demonstrably greater than the probative value of the evidence.

31. No other special problems of prejudice appear in the record. The evidence was not presented in a misleading manner and the defi-

Eben's final specification of error is that AS 12.45.083(d), which allows a defendant to unilaterally waive a jury trial where "a defense based on mental disease or defect" is offered to preclude criminal responsibility, should be read to require a bifurcated trial on request. Eben, in his reply brief, concedes that this argument is not viable in light of *Post v. State*, 580 P.2d 304, 306 (Alaska 1978), which held that AS 12.45.-083(d) did not create a statutory right to a bifurcated trial. Eben does not contend that the superior court abused its discretion in denying his motion for a bifurcated trial. At the hearing on that motion, the superior court fairly considered the factors which should guide a trial judge's discretion in ruling on such a motion.[32]

Eben's convictions of two counts of murder in the second degree are Affirmed.

ciency in the information as to the exact location of the knives was apparent in the testimony of Charlotte and Wayne Eben. As with any evidence, it was the jury's duty to assess the strength of the state's "choice of knives" theory.

**32.** The ruling on this motion was made by Superior Court Judge Ralph Moody.