William Guy McMAHAN, Appellant,

v.

STATE of Alaska, Appellee.

No. 3389.

Supreme Court of Alaska.

Oct. 10, 1980.

Phillip P. Weidner, Drathman, Weidner & Bryson, Anchorage, for appellant.

John A. Scukanec, Asst. Dist. Atty., Joseph D. Balfe, Dist. Atty., Anchorage, and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ., and DIMOND, Senior Justice.*

## OPINION

DIMOND, Senior Justice.

William McMahan kicked open the door to an apartment, and with a rifle, shot and killed Steven Gribble.[1] McMahan was convicted by a jury of first degree murder. He appeals on numerous grounds. His first contention is that the police elicited from him, at various times, incriminatory statements in violation of the *Miranda* rule.

---

* This case was submitted to the court for decision prior to Justice Boochever's resignation.

1. The occupant of the apartment was a lady who was referred to by McMahan as "my woman." McMahan had been drinking and was jealous of the attention paid to this woman by Steven Gribble.

## I. *MIRANDA*

After oral argument, we ordered this case remanded for an evidentiary hearing, primarily to clarify the *Miranda* issues. Following the evidentiary hearing, the trial court entered findings of fact and conclusions of law. That court found that McMahan's statements on October 13, 1976, were unsolicited and spontaneous. The court concluded that McMahan was fully advised of his rights on October 14, 1976, and on that occasion he waived his rights freely and voluntarily before making the statement which was recorded on tape. We shall discuss each of McMahan's statements separately.

### A. *The First Incident*

■ Police Officer Cooper arrived at the apartment minutes after the shooting. He placed McMahan in handcuffs, and shortly thereafter escorted McMahan to jail. On the way to the jail, which was a short distance away, McMahan said, "I shot him . . . I shot him before he could shoot me," and said something to the effect that the victim was "messing with my woman." The trial court found that these statements were not given in response to any questioning by Cooper, and thus were unsolicited.

We have recognized that volunteered statements of any kind are not barred by the fifth amendment and their admissibility is not affected by the *Miranda* rule. *Soolook v. State*, 447 P.2d 55, 60 (Alaska 1968), *cert. denied*, 396 U.S. 850, 90 S.Ct. 107, 24 L.Ed.2d 99 (1969).[2] There is no evidence that McMahan's statements at this time were anything but spontaneous. We hold, therefore, that they were properly admit-

ted, and that the *Miranda* rule was not violated.

### B. *The Second Incident*

Approximately thirty seconds after McMahan had made the statements to Officer Cooper, he and Cooper arrived at the jail.[3] Chief Bagron arrived at the jail immediately after McMahan's arrival. At that time, the testimony revealed that McMahan was bleeding from a cut over his eye, that he smelled of alcohol, and that he was yelling profanities.[4] While attempting to stop the flow of blood from the cut over his eye with a gauze compress, Bagron tried to shout the *Miranda* warnings over McMahan's yelling.[5]

Bagron testified that McMahan "appeared excited, keyed up," and that he did not respond to the warnings, but kept yelling. However, Bagron indicated that McMahan "knew all this stuff . . . [he said] 'I know all this shit.'" It is not clear from the record when McMahan gave this acknowledgment. Eventually, McMahan made incriminating statements. He said, "I killed the son of a bitch. He shot at me earlier in front of [a bar]." Although Bagron initially claimed that the statements were unsolicited, he later admitted that they were given in response to his questioning.

■ On remand, the trial court found that the statements were admissible because no police officer "questioned the appellant on October 13, 1976 [the day of the killing, and] his statements were unsolicited and spontaneous." McMahan argues that this finding is clearly erroneous. We agree.

---

2. *See Eben v. State*, 599 P.2d 700, 708–09 (Alaska 1979); *Padgett v. State*, 590 P.2d 432, 436 (Alaska 1979); *Ladd v. State*, 568 P.2d 960, 966–67 (Alaska 1977), *cert. denied*, 435 U.S. 928, 98 S.Ct. 1498, 55 L.Ed.2d 524 (1979).

3. The apartment was located approximately 40 to 50 steps from the jail.

4. McMahan received a cut over one eye during a struggle in the hallway of the apartment building when a person attempted to detain him until the police arrived.

5. Normal practice was to read the *Miranda* rights from a card and then obtain a written waiver. Bagron did not read the rights but gave them from memory. According to Bagron, "I told him that he had a right to remain silent. Anything he would say would be held against him in a court of law. He had a right to an attorney. That if he decided to answer questions, he had a right to stop answering questions." Even though a waiver form was nearby, Bagron did not ask for a waiver.

The trial court's finding was in error because Chief Bagron admitted that the statements by McMahan were made in response to questioning. Consequently, they were not admissible as spontaneous and unsolicited statements. We must, therefore, determine whether these statements were made after McMahan was adequately informed of, and waived, his *Miranda* rights.

■ At the time McMahan made these statements, it is clear that he was in "custody" since he had been placed in handcuffs and was in jail. *See Hunter v. State*, 590 P.2d 888, 895 (Alaska 1979). It is also clear that Bagron's questions constituted "interrogation," since they were "designed to elicit incriminating statements." *Eben v. State*, 599 P.2d 700, 708 (Alaska 1979). Consequently, Bagron was required to advise McMahan of his *Miranda* rights. *See State v. Cassell*, 602 P.2d 410, 415 (Alaska 1979); *Hunter v. State*, 590 P.2d 888, 893 (Alaska 1979).

■ McMahan argues that the *Miranda* warning given by Bagron was inadequate. We agree. We discussed in *State v. Cassell*, 602 P.2d 410, 416 (Alaska 1979), what must be included in the warnings given to satisfy the requirements of *Miranda*. There we held that the words, "you have a right to have an attorney and if you cannot afford to have an attorney one could be arranged to be appointed for you," were insufficient to convey to the suspect his right to counsel. We said:

> The *Miranda* warning given in this case falls short of this standard because it failed to advise Cassell of his present right to consult with an attorney and his right to have one appointed prior to questioning if he could not afford one. In addition, the warning did not clearly inform Cassell that *he had a right to have counsel present with him during interro-*

*gation.* These flaws in the *Miranda* warning are fatal to petitioner's case. *Id.* at 417–18 (emphasis added).

Concerning McMahan's right to counsel, Bagron merely informed him that he had the right to an attorney.[6] This falls well short of the *Cassell* standard. Furthermore, no attempt was made to determine if McMahan understood the warnings as given. In addition, the warnings must also be viewed in the circumstances in which they were given. Here, McMahan was bleeding from a cut over his eye while Bagron was administering first aid, and McMahan was shouting profanities while Bagron shouted the warnings. We hold in these circumstances that the warnings given were insufficient.

■ Nevertheless, admission of these statements is not cause for reversal because they added nothing of incriminating value to evidence which was legally obtained. McMahan said in essence: (1) he killed "the son of a bitch," (2) Gribble had shot at him earlier, and (3) "get the girl, she knows about this." As discussed in Part I-A, McMahan admitted while being escorted to the jail that he had shot Gribble. He claimed, "I shot him before he could shoot me." We held that this statement was admissible. Furthermore, McMahan testified at trial that he killed Gribble in self-defense and that he had taken his rifle to the encounter with Gribble because of fear that Gribble would shoot him. Therefore, admission of the statements made shortly after McMahan's arrival at the police station was harmless beyond a reasonable doubt.[7]

### C. The Third Incident

On October 14, 1976, the morning after the shooting, McMahan was taken to the courthouse for his arraignment. There, the magistrate attempted to advise McMahan

---

**6.** The full text of Bagron's warning is set out in note 5 *supra*.

**7.** Erroneous admission of evidence is harmless beyond a reasonable doubt under the standard of *Chapman v. California*, 386 U.S. 18, 23–24,

87 S.Ct. 824, 827–28, 17 L.Ed.2d 705, 710–11 (1967), when it is unreasonable to conclude that the evidence influenced the verdict. *See, e. g., Benefield v. State*, 559 P.2d 91, 95–96 (Alaska 1977).

of his *Miranda* rights.[8] The magistrate told McMahan that he would be transported to Anchorage where he would have an opportunity to talk with a public defender.

After McMahan's return to jail, and approximately twenty minutes after his arraignment, Bagron, in the presence of Officers Gorman and Collins, read McMahan his *Miranda* rights from a booking card.[9] Although a tape recorder was available, as well as a written waiver form, the reading of the *Miranda* rights was not recorded and no attempt was made to get a waiver either signed by McMahan or to have a waiver stated by McMahan and placed on the tape. McMahan said that he had not object to the use of the tape recorder. Officer Gorman conducted an interrogation at that time, and obtained a confession from McMahan. This was played for the jury at the trial.[10] On remand, the trial court concluded that McMahan had waived his rights freely and voluntarily.

The applicable standard for determining whether a defendant has waived his constitutional rights was articulated in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966):

> A heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.

The *Miranda* opinion further provides:

> Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and

has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders.

An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained. A statement we made in *Carnley v. Cochran*, 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70, 77 (1962), is applicable here:

> "Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not a waiver."

*Id.* at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724. *See also Tarnef v. State*, 512 P.2d 923 (Alaska 1973).

 The state's burden of showing that a confession was voluntary and that the defendant had waived his *Miranda* rights can be met by a preponderance of the evidence. In determining voluntariness, the court must look to the totality of the circumstances surrounding the defendant's statements. *See Quick v. State*, 599 P.2d 712, 720 (Alaska 1979); *Hampton v. State*, 569 P.2d 138, 141–44 (Alaska 1977), *cert. denied*, 434 U.S. 1056, 98 S.Ct. 1225, 55

---

**8.** The magistrate told McMahan:

> You have the right to have an attorney represent you at all of these proceedings and if you feel you can not afford an attorney, the court can appoint a public defender to represent you. You also have the right to remain silent. That is, no one can compel you to make any statement, however, any statement you do make can be used against you in a court of law.

> We note that this warning did not inform McMahan that he had a right to have counsel present with him during the following interrogation. *See State v. Cassell*, 602 P.2d 410, 415 (Alaska 1979).

**9.** The booking card read:

> You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you're being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statements.

**10.** According to Gorman, Bagron asked McMahan if he wanted a lawyer present. He replied that he did not feel it was necessary "to have one at that point."

L.Ed.2d 757 (1978); *Schade v. State*, 512 P.2d 907, 916 (Alaska 1973).

■ McMahan had been properly informed of his *Miranda* rights, and he had indicated that he understood those rights before the tape recording took place. There was no indication in the record that McMahan was in bad physical or mental shape when he gave the taped statement, which was the day following his arrest. Before the statement was recorded, McMahan was asked if he desired an attorney or if he objected to being taped. He replied, "No." During the taped statement, Officer Gorman asked McMahan, "Now it doesn't bother you us talking to you now does it?" McMahan replied, "No." Considering the totality of the circumstances under which McMahan gave his recorded statement, we hold that there was substantial evidence to support the trial court's conclusion that McMahan intended to waive his *Miranda* rights. His subsequent statements were therefore admissible at the trial.[11]

McMahan argues that we should adopt a prophylactic rule prohibiting the use of custodial statements where it is demonstrated that an explicit waiver could have been obtained. We note, however, that the United States Supreme Court recently rejected a *per se* rule that an express waiver is necessary where an accused indicates an understanding of his rights and gives a statement without expressly waiving them. *North Carolina v. Butler*, 441 U.S. 369, 373 - 76, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286, 292–94 (1979) (4–1–3 decision).[12] The Supreme Court said:

An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. *The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case.* As was unequivocally said in *Miranda*, mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.

*Id.* at 373, 99 S.Ct. at 1757, 60 L.Ed.2d at 292 (emphasis added) (footnote omitted).

## II. FALSE GRAND JURY TESTIMONY

Another point presented by McMahan's appeal is whether the indictment of first degree murder against him is defective because of false police testimony to the grand jury.

Police Chief Bagron testified before the grand jury that he had gone to the scene of the shooting and that he had been present while the body was still there. He was asked by a grand juror if he had noticed whether there had been a knife on the counter of the apartment or anywhere near

**11.** Again we advise law enforcement agencies that, as part of their duty to preserve evidence, it is incumbent upon them to tape record, where feasible, any questioning and particularly that which occurs in a place of detention. *Mallott v. State*, 608 P.2d 737, 743 n.5 (Alaska 1980). Furthermore, as we stated in *In re S. B.*, 614 P.2d 786, 790, n.9 (Alaska 1980):

It will be a great aid to the trial court's determinations and our own review of the record if an electronic record of the police interview with a defendant is available from which the circumstances of a confession or

other waiver of *Miranda* rights may be ascertained.

In addition, if *Miranda* rights are read to the defendant, this too should be recorded.

**12.** It also appears that many states have rejected a *per se* rule. *See Butler*, 441 U.S. at 375 n.6, 99 S.Ct. at 1758 n.6, 60 L.Ed.2d at 293 n.6, for a list of these states. *Contra, Commonwealth v. Bussey*, 404 A.2d 1309, 1314–15 (Pa. 1979).

the body. Bagron answered, "Yes I—I did. There were—there was no sign of a knife or sheath or any other weapon." Immediately afterward the following questioning occurred:

Q. Did you go through the deceased's clothing?

A. Yes, I did.

Q. Was there a pocketknife?

A. No, sir.

At trial Bagron contradicted his grand jury testimony. He testified that, in removing the personal effects from Gribble's body, he found a folded jackknife [13] in one of Gribble's pockets. McMahan contends that Bagron's false grand jury testimony requires dismissal of the indictment. He argues that, if Bagron had testified accurately, the grand jury might have found the homicide legally justified as an act of self-defense and refused to return an indictment, or that the grand jury might have charged only second degree murder or manslaughter on the ground that the defendant's belief regarding harm to himself was reasonable.

We considered the question of when false grand jury testimony requires dismissal of an indictment in *Keith v. State*, 612 P.2d 977 (Alaska 1980). We held that the standards for evaluating attacks on an indictment set forth in *Taggard v. State*, 500 P.2d 238 (Alaska 1972), were applicable:

The indictment is the foundation underlying a criminal prosecution. If the indict-

ment is seriously flawed, the conviction cannot stand.

A mere formal defect does not require dismissal of an indictment after the guilt of the defendant has been established at a fair trial. But courts do not hesitate to dismiss an indictment, even after a conviction, when the defect in the indictment is substantial. The conviction must be overturned when an indictment is invalid and the error was properly preserved by a timely objection prior to trial.

*Taggard*, 500 P.2d at 243 (footnotes omitted), *quoted in Keith*, 612 P.2d at 980–81.

 Assuming that the objection was properly preserved at trial,[14] we must determine whether the defect was substantial. In *Keith* this court noted that the giving of false grand jury testimony apparently had been unintentional. We held that "if the unintentional misstatement goes to a nonmaterial fact that would not substantially affect the grand jury's conclusion, it would not be reversible error." *Keith*, 612 P.2d at 981.

In this case it is not clear whether the giving of false testimony was unintentional.[15] Nevertheless, we believe that under *Taggard* the indictment stands, unless the misstatement would substantially affect the grand jury's conclusion. *See Taggard v. State*, 500 P.2d 238, 243 (Alaska 1972). The presence of a folded pocketknife in the deceased's pocket does not substantiate any

---

**13.** The knife which was found in Gribble's pocket was later identified as a folding knife of the nonlocking type, with a two and three-quarter inch blade.

**14.** McMahan's failure to object to the false grand jury testimony prior to trial is excused because the falsity of Bagron's testimony was not apparent until Bagron gave contradictory testimony at trial. The record on appeal does not disclose any instance at trial in which McMahan argued that the indictment was defective because of false grand jury testimony. We are not required to consider this type of attack on an indictment unless it is preserved at trial, *Keith v. State*, 612 P.2d 977, 981 (Alaska 1980), but the state does not argue that McMahan failed to preserve the objection.

**15.** Bagron's grand jury appearance was only eight days after his search of Gribble's body. When asked at trial why he did not admit to the grand jury that he had found a pocketknife, he said, "I don't remember." During his grand jury testimony, Bagron had been aware of McMahan's claim that Gribble had lunged at him with a knife.

At the evidentiary hearing on remand from this court, Bagron claimed that he had not remembered about the pocketknife during his grand jury appearance and that an inventory slip jogged his memory just prior to trial. Bagron's memory at the evidentiary hearing more than three years after his observation of the pocketknife was sufficient for him to estimate the length of the knife's blade.

theory of self-defense. Therefore, Bagron's misstatement is not so material as to require dismissal of the indictment.

We have earlier held that the prosecutor has a duty to present exculpatory evidence to the grand jury pursuant to Criminal Rule 6(q). *Frink v. State*, 597 P.2d 154, 164–66 (Alaska 1979). We need not decide whether the prosecutor is charged under Rule 6(q) with the police chief's knowledge [16] because the evidence of the pocketknife was not so material that it reasonably tended to negate McMahan's guilt. *See Mallott v. State*, 608 P.2d 737, 744 (Alaska 1980).

## III. BIFURCATION MOTION

At the beginning of McMahan's trial, his attorney requested that the trial be bifurcated. The reason for this request was that there would be a potential conflict between (a) McMahan's defense of self-defense, and (b) his defense of diminished capacity due to large amounts of alcohol he had consumed in the hours preceding the shooting of Steven Gribble. The trial judge denied the motion, stating that there is no statutory right to a bifurcated trial.

█ It is true that there is no statute governing this matter.[17] But apart from statute, the trial court, in its discretion, may grant a bifurcated trial under its common law power to control the submission of issues to a jury.[18] Indeed, it must do so where a defendant shows that he has a substantial insanity defense and a substantial defense on the merits, such as self-defense, and it is evident that either defense would be prejudiced by simultaneous presentation with the other. Thus, in *Houston v. State*, 602 P.2d 784, 787–88 (Alaska 1979), we held that, because Houston had a substantial insanity defense, denial of a bifur-

cated trial substantially prejudiced him in the presentation of his theory of self-defense.

█ We need not decide at this time whether the bifurcation principle of *Houston* applies when the defense of diminished capacity is raised rather than insanity. Assuming that there could be a conflict between the defenses of diminished capacity and self-defense, McMahan was not entitled to bifurcation unless he presented substantial evidence to support a valid self-defense theory. This he did not do.

█ McMahan and Sheila Robicheaux lived together for a couple of months. McMahan moved out of the apartment they had shared after an argument between them. A few days later, on October 12, 1976, Robicheaux introduced McMahan to Gribble and told McMahan that she and Gribble planned to share an apartment.

McMahan testified that he talked further with Gribble on October 13. According to McMahan, Gribble told him not to go back to Sheila Robicheaux's apartment and threatened him by saying, "I have a new rifle and I wouldn't want to use it—have to use it on you." Some time after parting company with Gribble, McMahan decided to go to Robicheaux's apartment. He testified that he took his rifle with him because he believed, "I'd be foolish to go back up there if I wasn't able to defend myself." McMahan claimed that he shot Gribble because, when he entered the apartment, Gribble came at him with a knife.

This testimony by McMahan does not substantially support a theory of self-defense. In *Bangs v. State*, 608 P.2d 1 (Alaska 1980), we held that a defendant in a similar factual situation was not entitled to a self-de-

---

**16.** The prosecutor's discovery obligations under *Criminal Rule 16(b)(4)* "*extend to material* and information in the possession or control of . . . any others who have participated in the investigation or evaluation of the case and who either regularly report or with reference to the particular case have reported to his office."
 As in *Keith*, 612 P.2d at 981, the prosecutor in this case was not shown to have known that

the evidence presented to the grand jury was false.

**17.** *Houston v. State*, 602 P.2d 784, 787 (Alaska 1979); *Post v. State*, 580 P.2d 304, 306 (Alaska 1978).

**18.** *Holmes v. United States*, 363 F.2d 281 (D.C. Cir.1966), cited with approval in *Kinsman v. State*, 512 P.2d 901, 903–04 (Alaska 1973).

fense instruction. We reasoned that, when a defendant has a prior grievance with the deceased and takes a deadly weapon to an encounter with the deceased, the defendant should be deemed to have provoked the violence which resulted in the death of the deceased. This is because the defendant in such a situation " 'knows or reasonably should know that the encounter will result in mortal combat.' " *Bangs*, 608 P.2d at 5, quoting *State v. Millett*, 273 A.2d 504, 510 (Me.1971). *See also Gray v. State*, 463 P.2d 897, 908 (Alaska 1970). Under that reasoning, McMahan did not present a valid theory of self-defense.

■ McMahan has raised several other points on appeal. However, after careful consideration, we have determined them to be unpersuasive and not to merit discussion in this opinion.[19] The judgment of the trial court is AFFIRMED.

RABINOWITZ, C. J., not participating.

---

19. On remand, we ordered the superior court to inquire into an item of possible evidentiary value belonging to the victim which was not produced at trial because the police sent the item out of state to the victim's next of kin. The superior court determined that had this item "been produced at trial it would not have led the jury to entertain a reasonable doubt as to appellant's guilt." We agree.

Nevertheless, we remind law enforcement agencies that their duty to preserve evidence includes the retention of items of potential evidentiary value to the defense. *See Catlett v. State*, 585 P.2d 553, 558 n.5 (Alaska 1978).